[Cite as *State v. Prade*, 2018-Ohio-3551.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS | |
| | )ss: | NINTH JUDICIAL DISTRICT | |
| COUNTY OF SUMMIT | ) | | |

STATE OF OHIO

    Appellee

    v.

DOUGLAS PRADE

    Appellant

C.A. No.    28193

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 1998-02-0463

DECISION AND JOURNAL ENTRY

Dated: September 5, 2018

TEODOSIO, Judge.

{¶1} Defendant-Appellant, Douglas Prade, appeals from the judgment of the Summit County Court of Common Pleas, denying his motion for a new trial. This Court affirms.

I.

{¶2} Almost twenty years ago, a jury convicted Mr. Prade for the aggravated murder of his ex-wife, Dr. Margo Prade. In 2013, a trial court found him actually innocent due, in large part, to new DNA evidence. The court granted Mr. Prade's motion for post-conviction relief, but also found that he was entitled to a new trial "should [its] order granting post-conviction relief be overturned pursuant to appeal * * *." On appeal, this Court did, in fact, overturn the post-conviction ruling. *See State v. Prade*, 9th Dist. Summit No. 26775, 2014-Ohio-1035. We did not address the alternative ruling for a new trial, however, because it was conditional in nature and, as such, did not constitute a final, appealable order. *See id.* ¶ 15, fn. 3. *See also State v. Prade*, 9th Dist. Summit No. 26814 (Mar. 27, 2013) (dismissing State's first attempted appeal

from the new trial order).  It was our mandate that the post-conviction ruling be reversed and the cause remanded for further proceedings consistent with our opinion.[1]  *Prade*, 2014-Ohio-1035, at ¶ 131.

{¶3}  Following our remand, the State immediately appealed from the new trial ruling to protect its appellate rights in the event that our decision had rendered the trial court's conditional ruling final.  This Court dismissed the appeal, however, and reiterated that the new trial ruling was not final and appealable.[2]  *See Sate v. Prade*, 9th Dist. Summit No. 27323 (Aug. 14, 2014).  The State then filed a motion in the trial court, requesting reconsideration of the new trial ruling.  Though Mr. Prade opposed that request and asked the court to simply reenter the new trial ruling on an unconditional basis, the court refused to do so.[3]

{¶4}  Subsequently, Mr. Prade filed a supplemental memorandum in support of his motion for a new trial.  The trial court accepted numerous briefs from both parties and ultimately set the matter for an evidentiary hearing, limited to testimony from the four DNA experts who had testified at the post-conviction hearing.  When the hearing concluded, the court took the matter under advisement and allowed the parties to file post-hearing briefs.  Upon review of all

---

[1] Mr. Prade sought to appeal from this Court's judgment, but the Ohio Supreme Court declined jurisdiction over his appeal.  *See State v. Prade*, Ohio Supreme Court Case No. 2014-0432 (July 23, 2014).  He also later sought a writ of prohibition in the Ohio Supreme Court, arguing that this Court lacked jurisdiction to review and overturn a finding of actual innocence.  Upon review, the Ohio Supreme Court denied his writ.  *See State ex rel. Prade v. Ninth Dist. Court of Appeals*, 151 Ohio St.3d 252, 2017-Ohio-7651.

[2] Though Mr. Prade attempted to appeal this Court's finality determination, the Ohio Supreme Court declined jurisdiction over his appeal.  *See State v. Prade*, Ohio Supreme Court Case No. 2014-1992 (Apr. 29, 2015).

[3] Notably, the trial judge who had awarded Mr. Prade a new trial on a conditional basis was no longer on the bench when this matter was remanded.  Another trial judge, who had not heard the post-conviction evidence, inherited the case.

the motions, briefs, testimony, and evidence in the case, the court then denied Mr. Prade's motion for a new trial.

{¶5} Mr. Prade now appeals from the trial court's judgment and raises one assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED IN RECONSIDERING, AND ABUSED ITS DISCRETION IN DENYING, THE MOTION FOR A NEW TRIAL.

{¶6} In his sole assignment of error, Mr. Prade argues that the trial court erred when it reconsidered and denied his motion for a new trial. He argues that, upon remand from this Court, the trial court should have simply reentered the 2013 new trial ruling on an unconditional basis. Alternatively, he argues that the court abused its discretion when it rejected his motion on its merits. We disagree with both propositions.

**Reconsideration of the New Trial Ruling**

{¶7} When the question presented on appeal is strictly one of law, this Court applies a de novo standard of review. *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 4. "A de novo review requires an independent review of the trial court's decision without any deference to [its] determination." *State v. Consilio*, 9th Dist. Summit No. 22761, 2006-Ohio-649, ¶ 4.

{¶8} "The law-of-the-case doctrine provides that legal questions resolved by a reviewing court in a prior appeal remain the law of that case for any subsequent proceedings at both the trial and appellate levels." *Giancola v. Azem*, Slip Opinion No. 2018-Ohio-1694, ¶ 1, citing *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984). "[T]he doctrine functions to compel trial courts to follow the mandates of reviewing courts" such that trial court are "without authority to

extend or vary the mandate given." *Nolan* at 3-4.  Yet, the doctrine "'comes into play only with respect to issues previously determined * * *.'" *Giancola* at ¶ 16, quoting *Quern v. Jordan*, 440 U.S. 332, 347 (1979), fn. 18.  It does not bind trial courts with respect to issues that fall outside the compass of a reviewing court's mandate.  *Giancola* at ¶ 16, quoting *Quern* at 347, fn. 18, quoting *Sprague v. Ticonic Natl. Bank*, 307 U.S. 161, 168 (1939).

{¶9}    Mr. Prade argues that the trial court erred when it reconsidered his motion for a new trial because, in doing so, it ignored a mandate from this Court.  According to Mr. Prade, this Court ordered the trial court, on remand, to reenter the 2013 new trial ruling on an unconditional basis so as to generate a final, appealable order.  He argues that the trial court acted without authority when it chose to disregard that mandate and reconsider the ruling.

{¶10} The record does not support Mr. Prade's contention that this Court issued a mandate, ordering the trial court to reenter the 2013 new trial ruling.  This Court has referenced the 2013 new trial ruling, in varying degrees, on three separate occasions.  On the first occasion, the State attempted to appeal from the ruling, and this Court dismissed its appeal.  *See State v. Prade*, 9th Dist. Summit No. 26814 (Mar. 27, 2013).  In doing so, we unequivocally held that the new trial ruling was not a final, appealable order.  *See id.*, citing 46 Am. Jur. 2d Judgments § 168 ("If a judgment looks to the future in an attempt to judge the unknown, it is wholly void because it leaves to speculation and conjecture what its final effect may be.").  Because the ruling was not final, it was not properly before us, so we did not issue any mandate.

{¶11} On the second occasion, this Court referenced the new trial ruling in the procedural history portion of our decision on the trial court's post-conviction ruling.  *See Prade*, 2014-Ohio-1035, at ¶ 13. We specifically noted, however, that the new trial ruling itself was not

at issue in the appeal. *Id.* at ¶ 15, fn. 3. Accordingly, we issued no mandate with respect to that ruling.

{¶12} The third occasion arose when the State once again attempted to appeal from the new trial ruling, following this Court's decision on the post-conviction/actual innocence ruling. *See State v. Prade*, 9th Dist. Summit No. 27323 (Aug. 14, 2014). In dismissing the State's second attempted appeal, we (1) reiterated our prior determination that the new trial ruling was "conditional and, therefore, not final and appealable," and (2) found that determination to be "the law of the case with respect to this proceeding." *Id.*, citing *State v. Prade*, 9th Dist. Summit No. 26814 (Mar. 27, 2013). We then went on to discuss the actual language the trial court had employed in its entry and why that language was problematic. We noted, in dicta, alternative language that the court could have used to achieve a final order. In summarizing that discussion, we wrote: "Thus, in order to make its decision to grant the motion for new trial a final order, the trial court must simply reenter its order granting the motion for new trial on an unconditional basis." *Prade*, 9th Dist. Summit No. 27323, at *2 (Aug. 14, 2014). That language, however, did not equate to a mandate ordering the trial court to take that action on remand. *Compare* App.R. 27. Because the State's attempted appeal stemmed from a non-final order, our jurisdiction was limited. *See* Ohio Constitution, Article IV, Section 3(B)(2) (appellate court jurisdiction limited to reviewing final orders of lower courts). Consistent with that limited jurisdiction and our prior determination, our decisive ruling was that the matter be dismissed for lack of a final, appealable order. Any additional language in our journal entry was, at best, dicta and was not binding authority on the lower court. *See Giancola*, 2018-Ohio-1694, at ¶ 16 (law of the case doctrine only pertains to issues previously decided by a superior court and matters within the compass of its controlling mandate).

{¶13} This Court has long held that "interlocutory orders are the proper subject of motions for reconsideration." *State v. Ford*, 9th Dist. Summit No. 23269, 2006-Ohio-6961, ¶ 5. *Accord Stow v. Sexton*, 9th Dist. Summit No. 17263, 1996 Ohio App. LEXIS 43, *4 (Jan. 10, 1996). When this Court reversed the trial court's post-conviction ruling and remanded this matter, the parties were placed in the position of being back before the trial court without it having issued an unconditional ruling on Mr. Prade's motion for a new trial. *See Giancola* at ¶ 21, quoting *State ex rel. Douglas v. Burlew*, 106 Ohio St.3d 180, 2005-Ohio-4382, ¶ 11, quoting *State ex rel. Stevenson v. Murray*, 69 Ohio St.2d 112, 113 (1982) ("'[U]pon remand from an appellate court, the lower court is required to proceed from the point at which the error occurred.'"). The trial court, therefore, had the authority to reconsider the initial ruling on Mr. Prade's motion for a new trial. *See Ford* at ¶ 5; *Sexton* at *4. Mr. Prade's argument to the contrary lacks merit.

**Denial of the Motion for New Trial**

{¶14} Crim.R. 33(A) allows a defendant to move for a new trial when his substantial rights have been materially affected. The rule enumerates several grounds upon which a defendant may seek a new trial, including newly discovered evidence. Crim.R. 33(A)(6).

> To warrant the granting of a motion for a new trial based upon newly discovered evidence, the defendant must show that the evidence:
>
> "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."

*State v. Tolliver*, 9th Dist. Lorain No. 16CA010986, 2017-Ohio-4214, ¶ 18, quoting *State v. Petro*, 148 Ohio St. 505 (1947), syllabus. This Court applies an abuse of discretion standard of review when reviewing a trial court's decision to grant or deny a motion for new trial based on

newly discovered evidence. *Tolliver* at ¶ 18. An abuse of discretion indicates that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶15} The last judgment we issued in this matter outlined, in exhaustive detail, the evidence that emerged at Mr. Prade's trial. *See Prade*, 2014-Ohio-1035, at ¶ 20-70. Rather than reproduce that discussion, we incorporate it herein and merely highlight certain pieces of evidence for purposes of context.

{¶16} Dr. Margo Prade was murdered on the morning of November 26, 1997, in the parking lot of her medical office. A lone assailant waited for her, approached her mini-van, entered on the front passenger's side, and shot her six times before fleeing. Signs of a struggle were evident from the scene inside the van, but none of Dr. Prade's personal belongings were taken. The murder weapon was never found and there were no witnesses to the actual murder. Yet, a bite mark, evidently left by the killer, was found on the underside of Dr. Prade's upper, left arm. She was wearing her lab coat at the time of her murder, so the section of the coat that encompassed the bite mark ("the bite mark section") was removed for DNA testing. At trial, the jury heard testimony from DNA experts as well as bite mark identification experts.

{¶17} With regard to the DNA testing, the jury heard from Thomas Callaghan, a forensic DNA examiner for the FBI. He explained that the FBI used polymerase chain reaction testing ("PCR testing") to test three cuttings from the bite mark section. Because the bite mark section was saturated with Dr. Prade's blood, however, the PCR testing only uncovered a single DNA profile consistent with her DNA. No additional profile that might have belonged to the

killer emerged. Consequently, even if the killer had left DNA on the bite mark section, the FBI's tests were unable to detect it.

{¶18} With regard to bite mark identification, the jury heard from three dental experts. *See Prade*, 2014-Ohio-1035, at ¶ 63-70. Dr. Lowell Levine, the State's first expert, testified that the bite mark pattern left on Dr. Prade was consistent with Mr. Prade's dentition, meaning that he could have caused it. Dr. Thomas Marshall, the State's second expert, testified that the bite mark pattern left on Dr. Prade matched Mr. Prade's dentition, meaning that he definitively caused it. Finally, Dr. Peter Baum, Mr. Prade's expert, testified that it was virtually impossible for Mr. Prade to bite anything due to a poorly fitted upper denture. Each expert was subjected to rigorous cross-examination and each made various concessions. For instance, Dr. Levine readily admitted that Dr. Prade's clothing could have affected the bite mark impression, that someone other than Mr. Prade could have caused it, and that he could only say, based on the limited value of the impression, that Mr. Prade might have been responsible for it. Accordingly, the jury heard a range of testimony on the issue of bite mark identification.

{¶19} The jury also heard a wealth of circumstantial evidence tending to implicate Mr. Prade. *See id.* at ¶ 121-127. There was evidence that he was verbally and physically abusive towards Dr. Prade during their marriage and engaged in stalking behavior both before and after they separated (e.g., wiretapping her calls, tracking her whereabouts, and accessing her medical office in the middle of the night). There was evidence that her murder occurred at a time when: (1) she was contemplating a new marriage and more children; (2) she planned on seeking a child support increase; (3) Mr. Prade's finances were in jeopardy; and (4) an insurance policy on her life, for which Mr. Prade was the sole beneficiary, was set to expire. With regard to the latter,

there was evidence that, shortly before the murder, Mr. Prade handwrote a tally sheet, subtracting his debts from that policy amount.

{¶20} Two witnesses placed Mr. Prade at the murder scene. The first witness said he saw Mr. Prade walking in an area adjacent to Dr. Prade's medical building shortly before the murder. The second witness said he saw Mr. Prade driving a car and speeding from the medical building's parking lot at a time when the murder would have just occurred. The gym where Mr. Prade claimed he was exercising during the murder was only a six minute drive from the murder scene, and Mr. Prade was unable to tender a solid alibi witness. Moreover, there was evidence that he appeared to have just showered when he arrived at the murder scene some two hours after the murder, despite his claim that he had spent the last two hours exercising.

{¶21} Dr. Prade's murder itself "was premeditated and very personal," *id.* at ¶ 125, as her killer shot her six times at close range and delivered a severe bite mark during the struggle. The evidence also "refuted any theory that a stranger had killed [her]," *id.*, as her killer approached her van in full view and entered in spite of the van's auto-lock feature (meaning that she either unlocked the door or her killer had keys to the van). Her killer was familiar with her schedule and lay in wait for her arrival. Additionally, there was significant testimony, from multiple sources, that the only person Dr. Prade feared and repeatedly had issues with was Mr. Prade.

{¶22} New DNA results that Mr. Prade obtained in 2012, more than 14 years after Dr. Prade's murder, were the catalyst behind his request for a new trial. The new tests were conducted using Y chromosome short tandem repeat testing ("Y-STR testing") and, for the first time, male DNA was discovered within an area of the bite mark section. Because Mr. Prade was definitively excluded as the source of that male DNA, he argued that there was a strong

probability the new DNA evidence would result in a different verdict, if submitted to a jury. He further argued that he was entitled to a new trial because, since 1998, bite mark identification testimony had undergone significant criticism. For ease of analysis, we separately address the new DNA evidence and the new bite mark identification evidence that Mr. Prade presented.

DNA Evidence

{¶23} Prior to Mr. Prade's trial, two laboratories examined the bite mark section: the FBI and the Serological Research Institute ("SERI"). As noted, the FBI originally tested three areas of the bite mark section using PCR testing and only obtained a single DNA profile consistent with Dr. Prade's DNA. Because Y-STR testing did not exist at the time, the FBI was unable to test the three cuttings solely for the presence of male DNA. Nevertheless, the FBI swabbed the three cuttings it made to create three extracts and retained those extracts for future use.

{¶24} When the FBI completed its testing, SERI received the bite mark section and tested it for amylase, a component of saliva. SERI mapped the entire bite mark section for amylase, meaning that its serologist (1) placed the entire bite mark section face down on a petri dish prepared with a hardened, gel solution, (2) weighed down the bite mark section to ensure proper contact, (3) left the bite mark section in place for several minutes, (4) lifted the bite mark section away, and (5) stained the gel solution in the petri dish with iodine to identify positive amylase patterns. The mapping test gave rise to three areas of "probable amylase activity," so SERI took cuttings from the bite mark section at each of those three areas. SERI then took two actions: it microscopically examined the three cuttings and it performed an amylase diffusion test in an attempt to extract and quantify any amylase in those three areas. The results of the diffusion test were that "[n]o amylase activity was detected." Meanwhile, the microscopic

examination of the three cuttings showed "few nucleated epithelial cells" (i.e., cells from the surface of one's body, including the mouth) on two of the cuttings and none on the third.

{¶25} Following the FBI and SERI's respective tests, the bite mark section was introduced as an exhibit at Mr. Prade's trial and admitted into evidence. There was testimony that, at trial, it was placed in an unsealed envelope before being admitted into evidence. It was then stored in that same unsealed envelope for more than ten years.

{¶26} At the end of 2010, the DNA Diagnostics Center ("DDC") took possession of the bite mark section as well as the three extracts that the FBI originally had created and retained. For reasons unknown, DDC was not able to obtain any DNA from the FBI's three extracts (i.e., not even Dr. Prade's). As to the bite mark section, DDC made a new cutting, extracted the DNA contained therein, and performed Y-STR testing on it. As explained in much greater detail in this Court's prior opinion, DDC obtained a partial male profile from that extract (19.A.1) and was able to exclude Mr. Prade as the source of that DNA. *See Prade*, 2014-Ohio-1035, at ¶ 74. That test, however, only returned limited results. It was estimated that the 19.A.1 extract only contained about three to five cells (a far cry from the ideal testing amount of 150 cells), and DDC was only able to identify three out of possible sixteen genetic markers. Seeking to capture more DNA and achieve a better result, DDC decided to perform another test.

{¶27} For its second test, DDC took three additional cuttings from the bite mark section, extracted DNA from them, and combined that extracted DNA with the 19.A.1 extract to form a new extract (19.A.2). When DDC tested the new extract (19.A.2), it uncovered about ten cells and achieved results at seven genetic markers, but detected the partial profiles of at least two males. *See id.* at ¶ 75-76. Mr. Prade was excluded as a source of any of the DNA found within the 19.A.2 extract. Importantly, however, the predominant male profile that emerged when DDC

tested its first extract (19.A.1) was different than the predominant male profile that emerged when it tested its second extract (19.A.2). *See id.* at ¶ 74-75, 115. Accordingly, questions arose as to whether DDC had uncovered any DNA that actually belonged to Dr. Prade's killer or whether it had only uncovered low-level DNA that was present due to contamination and/or transfer.

{¶28} Following DDC's tests, the bite mark section was sent to the Bureau of Criminal Investigation ("BCI") for additional testing. BCI took one additional cutting from the bite mark section and performed Y-STR testing on the cutting itself, a swab from the front side of the cutting, and a swab from the back side of the cutting. BCI was unable to obtain any DNA profile from the cutting itself, but the swabs of the cutting produced a partial male profile. Even so, the swabs returned results on so few genetic markers that BCI did not have enough information to draw any conclusions about the DNA it detected. *See id.* at ¶ 90.

{¶29} Apart from testing the bite mark section, BCI also conducted tests on other areas of Dr. Prade's lab coat to address the concern of widespread contamination. BCI took cuttings from four other areas of the lab coat and performed Y-STR testing on each area. *See id.* at ¶ 91. Its analyst failed to find any male DNA on any of the four tested areas.

{¶30} In reconsidering Mr. Prade's motion for a new trial, the trial court reviewed and heard anew a significant amount of testimony from experts who attempted to interpret all of the foregoing results. It was Mr. Prade's contention that at least some of the male DNA found within the bite mark section belonged to Dr. Prade's killer, so a new jury, hearing for the first time that he was not the source of any of that DNA, would exonerate him. Upon review of the evidence, however, the trial court rejected his contention. While the court agreed that Mr. Prade had set forth newly discovered DNA evidence, it found that he had failed to satisfy his burden

under *State v. Petro*. *See Petro*, 148 Ohio St. 505 at syllabus. The court determined that the new DNA results were cumulative of the old results to the extent that both excluded Mr. Prade. Further, it determined that the new results were of questionable value because "more likely than not the existence of the two partial male DNA profiles [that DDC discovered] occurred due to incidental transfer and/or contamination rather than containing the true DNA from [the] killer." When considering the new results in light of the overwhelming, circumstantial evidence against Mr. Prade at his trial, the court did not find there to be a strong probability that the new results would be outcome determinative if a new trial was granted. *See id.* Consequently, it refused to award Mr. Prade a new trial on the basis of the new DNA results.

{¶31} Mr. Prade argues that the court abused its discretion when it concluded that the new DNA results did not warrant a new trial. He argues that the new results are not cumulative in nature and create a strong probability that a new jury would reach a different result. As to the latter point, he maintains that multiple experts agreed it was highly likely that Dr. Prade's killer left DNA on her lab coat when biting her. He asserts that it was unreasonable for the court, in reviewing all the expert testimony, to conclude that all of the new DNA results were attributable to contamination and/or transfer DNA. Because the new results create reasonable doubt as to his guilt, Mr. Prade argues, the court ought to have granted his motion for a new trial.

{¶32} One of the experts Mr. Prade presented in support of his motion for a new trial was Dr. Rick Straub, a Ph.D. in genetics and independent consultant on forensic DNA testing. It was Dr. Straub's opinion that Dr. Prade's killer left his DNA on her lab coat and that the new DNA found within the bite mark section was "highly likely to be from the killer." He reasoned that the mouth is such a rich source of DNA that one would expect to find the killer's DNA "'before one would find the Y-STR profile of a male who engaged in incidental touching of the

lab coat before or after the attack.'" *Prade*, 2014-Ohio-1035, at ¶ 80. While SERI was unable to detect any quantifiable amount of amylase during its diffusion test in 1998, Dr. Straub had no doubt that its initial mapping test detected amylase. He explained that both the serologist's notes and a photograph of the completed mapping test supported that conclusion, as did the fact that the microscopic examination of two of the cuttings had revealed epithelial cells. Even so, he acknowledged that the serologist only saw a "few" epithelial cells and ultimately reported that "[n]o amylase activity was detected."

**{¶33}** Dr. Straub conceded that the second extract DDC tested (19.A.2) uncovered the partial profiles of at least two males. He further conceded that there was not a significant difference in the amount of cells attributable to each male. Dr. Straub believed that one of the males was the killer, but he was unable to say which male it was. He also was unable to say when or how at least one additional male's DNA came to be deposited on the bite mark section, other than to say that "[i]t would have had to have gotten on that lab coat in some way, shape or form."

**{¶34}** Assuming that the killer did deposit his DNA on the bite mark section, Dr. Straub testified to a number of factors that could have affected how much of that DNA remained by 2010. He indicated that DNA naturally degrades over time and the fact that both the FBI and SERI had already taken a total of six cuttings from the bite mark section "definitely decrease[d] [the] chances of finding a significant amount of DNA * * *." He also agreed that SERI's amylase mapping test was destructive in nature. He testified that "once you run that test, there's a really high probability that most of [the DNA] cells are removed from the material * * *." Given the limited results that DDC obtained, Dr. Straub agreed that any rich supply of DNA left

by the killer had been removed or degraded. He further agreed that if all of the new DNA results were attributable to contamination Mr. Prade's exclusion result "would be meaningless."

{¶35} The second DNA expert that Mr. Prade presented in support of his motion for a new trial was Dr. Julie Heinig, the Assistant Laboratory Director for DDC. In Dr. Heinig's opinion, it was "highly probable" that Dr. Prade's killer left DNA on her lab coat and that DDC uncovered it when testing the bite mark section. Much like Dr. Straub, she described the mouth as a rich source of DNA. She relied on that fact and the fact that a serologist had seen epithelial cells on cuttings taken from the bite mark section in 1998 to reach her conclusion that the male DNA found within the bite mark section was "substantially more likely" to have come from the killer than from another male who had incidentally come into contact with that area. *Prade*, 2014-Ohio-1035, at ¶ 76. Although DNA naturally degrades over time, Dr. Heinig was of the opinion that at least some of the killer's DNA still would have been present when DDC tested the bite mark section. She indicated multiple times that she found it unlikely DDC had only uncovered male DNA that was present due to contamination and/or transfer.

{¶36} Dr. Heinig acknowledged that the type of mapping test SERI performed on the bite mark section in 1998 was no longer routinely employed because it was a "very destructive" test. In fact, she stated that she "would expect [that test] to remove all of the cellular material" on an item. With respect to contamination, she agreed that the bite mark section was placed in an unsealed envelope at trial, was entered as an exhibit, and was stored in the unsealed envelope until DDC's technicians received it more than ten years later. She also agreed that the bite mark section had been tested numerous times over the years, thereby increasing the risk of possible contamination. She conceded that contamination and/or transfer DNA is one explanation for the appearance of below-threshold results at genetic markers within a tested sample.

**{¶37}** As to the test DDC performed on the extract labeled 19.A.2, Dr. Heinig agreed that the extract contained the DNA of at least two males. She admitted that she was unable to label either male's profile as the major or minor one due to the limited results her lab obtained. Indeed, she could not even quantify the extremely low number of cells that DDC had obtained from its tests. *See id.* at ¶ 78. Assuming that one of the profiles belonged to the killer, she was unable to say which one it was or when any of the DNA associated with those profiles had been deposited. She "conceded that, in order to have two different male profiles, either contamination or DNA from transfer DNA had to have occurred." *Id.* Further, she agreed that Mr. Prade's exclusion result was meaningless if all of the new DNA results were attributable to contamination.

**{¶38}** One of the experts the State presented in opposition to Mr. Prade's motion for a new trial was Dr. Elizabeth Benzinger, the Director of Research, Training, and Development at BCI. Dr. Benzinger opined that the male DNA found within the bite mark section was "'most easily explained by incidental transfer (patients, police, lab workers, court officials).'" *Id.* at ¶ 85. She reached that conclusion based on the extremely limited results that DDC and BCI obtained and the fact that, within those low-level results, DDC uncovered the partial profiles of multiple males. She testified that there is currently no mechanism for dating DNA, so it was impossible to determine when the DNA that DDC found was deposited. Though SERI reported probable amylase activity when conducting its mapping test in 1998, Dr. Benzinger opined that the lack of results on its subsequent, diffusion test cast doubts on the serologist's interpretation of the first test. Even if Dr. Prade's killer did leave behind some quantity of amylase and DNA on the bite mark section, however, Dr. Benzinger testified that it may not have been a high quantity

to begin with and other factors such as degradation and destruction due to previous testing may have affected that quantity.

{¶39} The second witness to testify for the State was Dr. Lewis Maddox, the DNA technical leader for BCI. Much like Dr. Heinig, Dr. Maddox opined that the male DNA found within the bite mark section was best explained by contamination and/or transfer. He noted that, even back in 1998, SERI only observed "a few nucleated epithelial cells on two of the sampled areas and none on the third area." He also noted that SERI was unable to confirm the presence of amylase within the bite mark section through quantification. He could not say if that was because there was so little there or because the mapping test had resulted in a false positive. Either way, however, Dr. Maddox would have expected to see quantifiable results "had there been a 'slobbering killer,' as suggested by one of the defense witnesses at trial." *Prade*, 2014-Ohio-1035, at ¶ 89.

{¶40} As to the results of DDC's tests, Dr. Maddox confirmed that they were all "low level" results and "definitely [from] more than one contributor * * *." He explained that no strong profile emerged such that there was "not a great difference between [the] two profiles" detected within the 19.A.2 extraction. Had the killer left a significant amount of DNA on the bite mark section, Dr. Maddox indicated that he would have expected "'a male profile of strong significant signal'" to have emerged. *Id.* He was unable to say with any degree of confidence that the male DNA found within the bite mark section came from the killer. He noted that BCI had not detected any male DNA on four other areas of Dr. Prade's lab coat (i.e., areas outside the bite mark section). According to Dr. Maddox, that fact caused him concern as an analyst because it suggested that the reason the bite mark section gave rise to inconsistent, low-level results while the lab coat did not was that the bite mark section had been "the primary focus of

attention" over the years and handled by a significant number of individuals. He indicated that, overall, the results DDC obtained did not appear to be very useful.

{¶41} Having reviewed the record, this Court cannot conclude that the trial court abused its discretion when it rejected Mr. Prade's request for a new trial on the basis of the new DNA results. *See Tolliver*, 2017-Ohio-4214, at ¶ 18. That is because, even if the new results are not cumulative of the old ones, Mr. Prade has not shown that there is a *strong probability* the new results would lead to a different outcome if introduced at a new trial. *See State v. Holmes*, 9th Dist. Lorain No. 05CA008711, 2006-Ohio-1310, ¶ 15 (new trial petitioner "has the burden of demonstrating that the newly discovered evidence created a strong probability of a different result if a new trial was granted"). The "'mere possibility'" that a new trial might lead to a different outcome is an insufficient basis upon which to grant a motion for a new trial. *State v. Murley*, 2d Dist. Champaign No. 08-CA-26, 2009-Ohio-6393, ¶ 26, quoting 90 Ohio Jurisprudence 3d, Trial, Section 665 (2009). *See also State v. Pannell*, 9th Dist. Wayne No. 96CA0009, 1996 Ohio App. LEXIS 3967, *13-14 (Sept. 11, 1996).

{¶42} Although both of Mr. Prade's experts were of the opinion that it was "highly likely" or "highly probable" that DDC discovered the killer's DNA within the bite mark section, both made several critical concessions. For example, both conceded that DDC detected the partial profiles of at least two males within the bite mark section and that neither one emerged as the significantly stronger profile. *See Prade*, 2014-Ohio-1035, at ¶ 115. There was testimony that, for that to have happened, some degree of contamination had to have occurred. Further, while Mr. Prade's experts rejected the notion that all of DDC's results were attributable to contamination, they both conceded that, within a year of the murder, SERI was unable to detect any quantifiable amount of amylase. *See id.* at ¶ 117 (noting that SERI's failure to detect any

quantifiable amount of amylase "undercut[] the assumption * * * that there had to be DNA from the biter on the lab coat due to the large amount of DNA in saliva."). They also both agreed that SERI subjected the entire bite mark section to a very destructive mapping test. Indeed, Dr. Heinig went so far as to say that she "would expect [that test] to remove *all* of the cellular material" on an item. (Emphasis added.) That portion of her testimony was inconsistent with her foundational logic that the killer's DNA must have endured due to the wealth of DNA contained in one's mouth. Moreover, she conceded that contamination is one explanation for the type of low-level results that DDC's and BCI's tests produced. In reviewing all of the evidence, the trial court reasonably could have questioned the ultimate opinions of Mr. Prade's experts.

{¶43} Neither Mr. Prade's experts, nor the State's experts could say when or how the male DNA that DDC uncovered was deposited on the bite mark section. The trial court heard testimony that DNA naturally degrades over time and that, by 2010, the bite mark section had already been highly sampled and subjected to several rounds of testing. Not even the three original extracts that the FBI sealed and retained produced any results when DDC tested them, despite widespread agreement that, at the very least, Dr. Prade's DNA should have been present. As such, there was ample reason for the trial court to conclude that both the passage of time and the amount of exposure the bite mark section had endured over the years were factors that bore upon the meaningfulness of the new DNA results. Given that fact and the fact that the State's experts both attributed the new results to contamination, the court reasonably could have concluded that the new results were of questionable value. It also reasonably could have concluded that those results would not be outcome determinative if introduced at a new trial. *See Petro*, 148 Ohio St. 505 at syllabus.

{¶44} This Court has recognized that "a new trial is an extraordinary measure and should be granted only when the evidence presented weighs heavily in favor of the moving party." *State v. Gilcreast*, 9th Dist. Summit No. 21533, 2003-Ohio-7177, ¶ 54. As detailed in our prior opinion, the State set forth an overwhelming amount of evidence against Mr. Prade at his trial. *See Prade* at ¶ 20-70, 121.

> The picture painted by that evidence was one of an abusive, domineering husband who became accustomed to a certain standard of living and who spiraled out of control after his successful wife finally divorced him, forced him out of the house, found happiness with another man, and threatened his dwindling finances. The evidence, while all circumstantial in nature, came from numerous, independent sources and provided answers for both the means and the motive for the murder.

*Id.* at ¶ 121. Although Mr. Prade's DNA profile did not match either of the partial profiles that DDC discovered, the partial profiles were of an entirely questionable value, given the significant and valid concerns that they all stemmed from contamination. *Compare State v. Jones*, 9th Summit No. 26568, 2013-Ohio-2986, ¶ 15-21 (retrial warranted where new DNA testing uncovered clear major and minor male DNA profiles and none of the tests identified the defendant as a contributor); *State v. Georgekopoulos*, 9th Dist. Summit No. 22491, 2005-Ohio-5106 (retrial warranted where new photographic evidence showed that the State's theory of the case was an impossibility). As noted, "'[t]he mere possibility of a different outcome is insufficient'" to warrant the granting of a motion for new trial. *Murley*, 2009-Ohio-6393, at ¶ 26, quoting 90 Ohio Jurisprudence 3d, Trial, Section 665 (2009). Bearing in mind the deferential standard of review that applies in this matter, we must conclude that the trial court acted within its sound discretion when it refused to award Mr. Prade the extraordinary measure of a new trial. *See Tolliver*, 2017-Ohio-4214, at ¶ 18; *Gilcreast* at ¶ 54. Because Mr. Prade did not show that the new DNA results "disclose[d] a strong probability that [they] [would] change the result if a new trial [was] granted,'" the trial court's decision to deny his motion for a new trial on that

basis was neither unreasonable, nor arbitrary, nor unconscionable. *Petro* at syllabus. This Court rejects his argument to the contrary.

Bite Mark Identification

{¶45} As noted, three dental experts testified at Mr. Prade's trial and offered a range of testimony related to the bite mark impression left on Dr. Prade's lab coat and the bruising pattern left on her skin. In his original motion for a new trial, Mr. Prade included a request for relief based on evidence that, since 1998, the science behind bite mark identification had sustained significant criticism. He presented the testimony of Dr. Mary Bush, an expert in forensic odontology research, who testified in great detail that neither the uniqueness of human dentition, nor its ability to transfer onto human skin in a unique way had been scientifically proven. *See Prade*, 2014-Ohio-1035, at ¶ 92-95. Additionally, he pointed the court to a number of scholarly works, including a 2009 report from the National Academy of Sciences, questioning the reliability of bite mark identification testimony.

{¶46} In response to Mr. Prade's motion, the State offered the testimony of Dr. Franklin Wright, Jr., an expert in forensic odontology. *Id.* at ¶ 96-101. Dr. Wright criticized several aspects of Dr. Bush's research methodology and the conclusions she drew therefrom. He opined that "bite mark evidence is generally accepted within the scientific community, but its value in any specific case depends upon the subjective interpretation of the analyst examining it." *Id.* at ¶ 96. He testified that bite mark evidence was best used "as part of * * * the total evidence[] that exists in [a] case" and cautioned against its use as the sole piece of evidence in a case. As to the bite mark testimony that the State presented at Mr. Prade's trial, Dr. Wright acknowledged that it was problematic in several respects. *Id.* at ¶ 101. In particular, he took issue with (1) Dr. Marshall's decision to testify in absolute terms that Mr. Prade was the biter, and (2) Dr. Lowell's

ultimate conclusion that Mr. Prade's dentition was consistent with the bite mark. He explained that he was critical of Dr. Lowell's conclusion because Dr. Lowell admitted that he had struggled to identify individual characteristics when studying pictures of the bite mark.

{¶47} Following this Court's remand in response to the trial court's actual innocence ruling, Mr. Prade supplemented his motion for a new trial with additional evidence. First, he supplied the court with a DVD recording of a television broadcast interview, wherein three of the jurors from his trial discussed how the State's bite mark evidence had influenced their verdict. Second, he supplied the court with the affidavit of another expert, Dr. Iain Alastair Pretty. Dr. Pretty attested to recent, significant changes to the guidelines for forensic bite mark analysis, as established by the American Board of Forensic Odontology ("the ABFO"). He stated that, under the new guidelines, the ABFO would disavow any expert opinion that purported to identify a specific individual as the one who actually caused a bite mark in an open population case (i.e., a case where "the universe of potential suspects is unknown"). He reviewed several photographs of the bite mark injury to Dr. Prade's arm and noted that he was unable to discern any individual tooth characteristics. He opined that, if the case were retried today, "there could be no opinion presented, consistent with ABFO guidelines, that purport[ed] to link the victim's injury to Mr. Prade's (or anyone else's) dentition."

{¶48} The trial court, on remand, declined to receive any oral testimony on the issue of bite mark evidence when it conducted additional hearings on the new DNA results. Instead, it allowed the parties to brief the issue and reviewed their written materials in conjunction with the testimony produced at the original hearings on Mr. Prade's motion for a new trial. The trial court ultimately determined that Mr. Prade's newly submitted evidence did not warrant a new trial. The court found that "[t]he reliability of bite mark evidence [had] been a matter of

contention for decades – long before the 1998 trial[–]" and that Mr. Prade's evidence merely reiterated the "same basic criticisms" that had existed at the time of trial. It found that Mr. Prade's evidence was largely cumulative of the specific expert testimony offered at the trial, as the jury had heard a wide range of testimony on the reliability of bite mark identification. *See Petro*, 148 Ohio St. 505 at syllabus. Further, it found that the evidence merely impeached certain aspects of that testimony, *see id.*, and did not eclipse the staggering amount of circumstantial evidence that had implicated Mr. Prade. The court concluded that Mr. Prade was not entitled to a new trial because he had failed to set forth newly discovered evidence or show that there was a strong probability his newly submitted evidence would lead to a different result if a new trial was granted. *See id.*

{¶49} Mr. Prade's argument on appeal is two-fold. First, he argues that the trial court abused its discretion when it refused to consider the television broadcast interview that he attached to his supplemental motion for a new trial. He argues that the interview evidenced the fact that at least three of the jurors who convicted him did so solely on the basis of the State's bite mark evidence. According to Mr. Prade, the interview was admissible in support of his motion for a new trial because he introduced it to show how the new bite mark evidence would change the result in this matter, not to "invalidate or challenge the original verdict in the sense Evid.R. 606(B) contemplates."

{¶50} Second, Mr. Prade argues that the trial court abused its discretion by denying his motion for a new trial on its merits. He argues that the evidence he submitted about the reliability of bite mark identification casts serious doubts upon the expert testimony that the State introduced at his trial. He asserts that it was unreasonable for the court to portray the newly submitted evidence as cumulative of the old evidence because the newly submitted evidence

demonstrated that, if the matter were retried today, the State would be unable to offer *any* expert testimony linking him to the bite mark. Because unreliable bite mark testimony resulted in his conviction, he argues, there is a strong probability that the newly submitted evidence would change the result in this matter if a new trial was granted.

**{¶51}** Upon review, this Court cannot address the merits of Mr. Prade's first argument that the trial court abused its discretion by excluding the television broadcast interview. That is because he has not provided us with an adequate record for our review. *State v. Farnsworth*, 9th Dist. Medina No. 15CA0038-M, 2016-Ohio-7919, ¶ 16 ("It is the appellant's responsibility to ensure that the record on appeal contains all matters necessary to allow this Court to resolve the issues on appeal."). According to Mr. Prade, the court conducted a hearing on June 12, 2015, and, at that hearing, entered its ruling on the admissibility of the interview. The record, however, does not contain a transcript from that hearing. Nor does it contain any oral or written ruling from the trial court, addressing the admissibility of the interview. As such, we cannot say whether the court found the interview inadmissible, or, if it did, whether it committed reversible error in doing so. *See State v. Ecker*, 9th Dist. Summit No. 28431, 2018-Ohio-940, ¶ 20 (absent an issue of law, an appellate court generally applies the abuse of discretion standard when reviewing evidentiary determinations). Because Mr. Prade has not supplied this Court with an adequate record, we cannot review his argument on that point. *See State v. Milano*, 9th Dist. Summit No. 28674, 2018-Ohio-1367, ¶ 15, fn. 1, quoting *State v. Knox*, 9th Dist. Lorain No. 16CA010985, 2018-Ohio-43, ¶ 12 (an appellant "may not hope to 'predicate reversal upon the basis of a silent record'"). Accordingly, we must presume regularity in the proceedings below insofar as Mr. Prade's argument concerns the television broadcast interview. *See State v. Burden*, 9th Dist. Summit No. 28367, 2017-Ohio-4420, ¶ 7.

{¶52} Having reviewed the record, we must conclude that the trial court acted within its discretion when it refused to award Mr. Prade a new trial on the basis of the bite mark evidence he presented. *See Tolliver*, 2017-Ohio-4214, at ¶ 18. Crim.R. 33(A)(6) only permits a defendant to seek a new trial upon the discovery of "new evidence" that he or she "could not with reasonable diligence have discovered and produced at the trial." *Accord Petro*, 148 Ohio St. 505 at syllabus. If a defendant could have discovered and produced evidence for trial, then that evidence is not the proper subject of a motion filed under Crim.R. 33(A)(6). *State v. Patton*, 9th Dist. Summit No. 17432, 1996 Ohio App. LEXIS 482, *9 (Feb. 14, 1996). Likewise, a defendant cannot prevail upon a Crim.R. 33(A)(6) motion if the motion rests upon evidence that is merely cumulative of former evidence or merely impeaches/contradicts it. *Petro* at syllabus. *Accord Jalowiec*, 2015-Ohio-5042, at ¶ 40; *State v. Diaz*, 9th Dist. Lorain No. 02CA008069, 2003-Ohio-1132, ¶ 32. Because Mr. Prade failed to set forth "new evidence" that was neither cumulative of the trial testimony, nor served merely to impeach or contradict it, he was not entitled to relief under Crim.R. 33(A)(6).

{¶53} In essence, Mr. Prade set forth evidence that, since 1998, additional research has resulted in amended guidelines, recommendations, and opinions about the reliability of bite mark identification evidence and the conclusions that an expert might reliably draw in any given case. As noted, however, the original jury in this matter heard a wide range of testimony on bite mark identification. *See Prade*, 2014-Ohio-1035, at ¶ 63-70, 129. That testimony included significant criticisms about the reliability of bite mark identification, as elicited by defense counsel on cross-examination. Indeed, even on direct examination, the State's first expert (Dr. Levine) drew attention to the limitations of such evidence, stressed that it should not be used as the only evidence in any case, and indicated that, at best, he could only say that Mr. Prade could have

made the bite mark in this case. Given the nature of the testimony introduced at trial, it was not unreasonable for the trial court to reject Mr. Prade's motion on the basis that his newly submitted evidence was merely cumulative of the trial testimony or merely served to impeach or contradict portions of it (e.g., Dr. Marshall's opinion that Mr. Prade definitively caused the bite mark). *See Petro*, 148 Ohio St. 505 at syllabus. More importantly, however, it was not unreasonable for the court to reject Mr. Prade's motion because it was unsupported by any newly discovered evidence.

{¶54} As noted, Crim.R. 33(A)(6) only provides an avenue for relief when a defendant uncovers "new evidence." The record supports the trial court's determination that Mr. Prade's newly submitted evidence merely spoke to the "same basic criticisms" that had plagued bite mark identification evidence "for decades." While the specific experts or studies Mr. Prade identified in his motion for new trial might not have been available to him in 1998, there was nothing to prevent him from discovering and producing for trial other similar opinions and studies about the unreliability of bite mark identification evidence.[4] He chose not do to so. Instead, he relied upon vigorous cross-examination and a defense expert who opined that he was incapable of inflicting the bite mark in this case. Mr. Prade cannot now attempt to cast additional criticisms about the reliability of bite mark evidence as "new evidence." *See* Crim.R. 33(A)(6); *Petro*, 148 Ohio St. 505 at syllabus. Moreover, even assuming that he did, in fact, introduce some "new evidence" in support of his motion, the trial court reasonably could have determined that it was unlikely to change the outcome here. *See Jalowiec*, 2015-Ohio-5042, at ¶ 38 ("Evidence that impeaches or contradicts the evidence at trial is not excluded from

---

[4] Notably, in opposing Mr. Prade's request for a new trial, the State offered a wealth of citations to articles and other literature that predated Mr. Prade's trial and criticized the reliability of bite mark identification.

consideration per se, but the character of that evidence is relevant to whether a different result is a strong probability [under *Petro*].").

**{¶55}** The State set forth an overwhelming amount of evidence against Mr. Prade at trial. *See Prade*, 2014-Ohio-1035, at ¶ 20-70, 121. It is not clear that any one piece of evidence, including the bite mark testimony, led the jury to convict him. His argument that, if this matter were retried today, the State would be unable to offer any admissible, inculpatory expert testimony linking him to the bite mark in this case is wholly speculative. That determination would be left to the sound discretion of the trial court in its gatekeeping function under *Daubert v. Merrill-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and this Court is not at liberty to predict which experts the State would actually tender or what testimony the trial court would or would not allow in the event of a retrial. *See, e.g., State v. Jackson*, 9th Dist. Summit Nos. 27132, 27133, 27158 & 27200, 2015-Ohio-5246, ¶ 51-54; *State v. Reives-Bey*, 9th Dist. Summit No. 25138, 2011-Ohio-1778, ¶ 18. Even if it is possible that the new bite mark evidence would lead to a different result upon retrial, "'[t]he mere possibility of a different outcome is insufficient'" to warrant the granting of a motion for new trial. *Murley*, 2009-Ohio-6393, at ¶ 26, quoting 90 Ohio Jurisprudence 3d, Trial, Section 665 (2009). Having carefully reviewed the record and continuing to bear in mind the deferential standard of review that applies in this matter, we must conclude that the trial court acted within its sound discretion when it refused to award Mr. Prade the extraordinary measure of a new trial. *See Tolliver*, 2017-Ohio-4214, at ¶ 18; *Gilcreast* at ¶ 54. Accordingly, his sole assignment of error is overruled.

## III.

**{¶56}** Mr. Prade's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

SCHAFER, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

DAVID BOOTH ALDEN, LISA B. GATES, and EMMETT E. ROBINSON, Attorneys at Law, for Appellant.

MARK B. GODSEY and BRIAN C. HOWE, Attorneys at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.