**[Cite as *State v. Bressi*, 2020-Ohio-4.]**

STATE OF OHIO      )                  IN THE COURT OF APPEALS
                            )ss:           NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

STATE OF OHIO                        C.A. No.      29257

      Appellant

      v.                              APPEAL FROM JUDGMENT
                                  ENTERED IN THE
JAMES P. BRESSI              COURT OF COMMON PLEAS
                                  COUNTY OF SUMMIT, OHIO
      Appellee               CASE No.     CR-2013-08-2314

<u>DECISION AND JOURNAL ENTRY</u>

Dated: January 2, 2020

---

TEODOSIO, Presiding Judge.

{¶1}    Appellant, The State of Ohio, appeals from the judgment of the Summit County Court of Common Pleas, granting Appellee, James P. Bressi, a new trial. This Court affirms.

I.

{¶2}    This Court previously set forth the underlying facts and procedural posture of this case as follows:

> Summit Pain Specialists is a medical organization that specializes in the treatment of individuals suffering from chronic pain. Before the events giving rise to this appeal, Bressi owned Summit Pain Specialists and operated it alongside his business partner, Dr. Robert Geiger. Bressi received his training in osteopathic medicine and frequently treated his patients using osteopathic manipulative treatment ("OMT"), a technique wherein an individual uses his hands to stretch and exert pressure on various muscles and joints to achieve optimal alignment and relieve pain. Starting in 2012, individuals began contacting the Stow Police Department to report that Bressi had engaged in inappropriate sexual contact with them when they came to him for treatment. The reports launched an intensive investigation led by Detective Jeff Swanson, who interviewed numerous patients and other individuals who had contact with Bressi. In March 2013, amidst accusations of inappropriate conduct and his breach of an office policy requiring the presence of chaperones during OMTs, Bressi was terminated from Summit

Pain Specialists. Sixth months later, the Stow Police Department's investigation culminated in his arrest.

A grand jury indicted Bressi on two counts of rape, thirteen counts of gross sexual imposition, and twelve counts of sexual imposition. The twenty-seven counts pertained to eleven different victims, ten of whom were Bressi's patients and one of whom, C.H., was a nurse on his staff. The incidents underlying the twenty-seven counts were alleged to have occurred at different times between May 2011 and March 2013.

\* \* \*

The jury found Bressi guilty of a single count of sexual imposition and not guilty of the remaining twenty-six counts against him. The court sentenced Bressi to fifty-nine days in jail, five years of probation, and a fine. Additionally, the court classified him as a tier one sexual offender.

*State v. Bressi*, 9th Dist. Summit No. 27575, 2016-Ohio-5211, ¶ 2-6.

{¶3} Bressi's conviction for sexual imposition was affirmed on appeal. *Id.* at ¶ 43. He appealed this Court's decision to the Supreme Court of Ohio, but the high court declined to accept jurisdiction. *See State v. Bressi*, 148 Ohio St.3d 1426, 2017-Ohio-905. He later moved the trial court for leave to file a motion for a new trial on account of newly discovered evidence. After a hearing on the matter, the trial court found that Bressi had demonstrated by clear and convincing proof he was unavoidably prevented from discovery of the new evidence, and thus granted his motion for leave to file a motion for a new trial. *See* Crim.R. 33(B). Bressi then filed his motion for a new trial based upon newly discovered evidence, which the court subsequently granted despite opposition from the State.

{¶4} This Court granted the State of Ohio leave to appeal from the trial court's judgment granting Bressi a new trial, pursuant to R.C. 2945.67(A) and App.R. 5(C). *See State v. Matthews*, 81 Ohio St.3d 375, 379 (1998) ("[A] trial court's order granting the defendant a new trial in a criminal case is a final appealable order which the state may appeal by leave of court."). The State raises one assignment of error for this Court's review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GRANTED BRESSI'S MOTION FOR A NEW TRIAL, MERITING REVERSAL AND VACATION OF THE TRIAL COURT'S ORDER.

{¶5} In its sole assignment of error, the State of Ohio argues that the trial court abused its discretion in granting Bressi's motion for a new trial. We disagree.

{¶6} Crim.R. 33(A) allows a defendant to move for a new trial when his substantial rights have been materially affected. Pursuant to Crim.R. 33(A)(6), a new trial may be ordered "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." To warrant the granting of a motion for a new trial based upon newly discovered evidence, the defendant must show that the evidence:

> "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."

*State v. Tolliver*, 9th Dist. Lorain No. 16CA010986, 2017-Ohio-4214, ¶ 18, quoting *State v. Petro*, 148 Ohio St. 505 (1947), syllabus.

{¶7} This Court applies an abuse of discretion standard of review when reviewing a trial court's decision to grant or deny a motion for a new trial based on newly discovered evidence. *Tolliver* at ¶ 18. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place*

*Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). In other words, "[i]t is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14.

{¶8} After Bressi filed a motion for leave to file a motion for a new trial, the trial court heard testimony from both Bressi and Z.B. at a hearing on August 8, 2017. Z.B. is the court-appointed receiver in a civil case involving Bressi and his former partners at Summit Pain. *See James P. Bressi, et al. v. Robert S. Geiger, et al.*, Summit Cty. Case No. CV 2014-04-2198. Bressi sought and obtained permission from the appointing court to subpoena Z.B. to testify in this matter. *See, generally, Barton v. Barbour*, 104 U.S. 126 (1881). In his capacity as receiver, Z.B. is broadly tasked with identifying, locating, and liquidating all assets involved in the civil matter.

{¶9} Z.B. testified that while carrying out his duties as receiver he met with the chief operating officer of Summit Pain ("R.G."). In his review of the company's "books," Z.B. testified that he discovered many improprieties, including missing files that had been removed prior to his arrival and a "tremendous amount of money that could not be accounted for." According to Z.B., salaries were "out of whack," receipts for large purchases were missing, and "tremendous amounts" of expenditures were coded as "business development[,]" yet no corresponding purchases could be found. Z.B. testified that R.G. began "tak[ing] everything that wasn't nailed down[,]" including all of the money out of the accounts, while leaving about

$70,000.00 in unpaid payroll. Some employees of Summit Pain contacted Z.B. after he was appointed and claimed that R.G. had assured them they were "protected" because the receiver would pay them when he arrived. Z.B. also testified that, once litigation was initiated thereafter, Dr. Geiger and his wife filed for bankruptcy.

{¶10} Z.B. eventually began reviewing over 20,000 emails in April or May of 2017, which were obtained in multiple batches from R.G.'s attorneys. Z.B. testified that he has worked almost full-time for ten months reviewing them all. The emails had been previously protected by Dr. Geiger's attorney-client privilege, but a waiver of that privilege was negotiated and obtained during Dr. Geiger's bankruptcy case. Z.B. testified that these emails included some correspondence between R.G. and his attorneys, in which R.G. asked, "[W]ould it be okay if they got C.H. to embellish her story of Mr. Bressi, would that work for them," but one of the attorneys replied, "[A]bsolutely not, don't do that." Z.B. further testified:

> [A]s the pattern goes and this case progresses, there are scores of incidents whereby [R.G., Dr. Geiger, and his wife] continued to ask their attorneys can we do this. The attorneys say absolutely not, and then the next e-mail between all three of them is how are we going to do this without permission of the attorneys, and they simply proceed to do it.
>
> In fact there are e-mails between the attorneys saying what are we going to do when it's found out that they did these things.

Z.B. clarified that "these things" meant getting C.H. to embellish her story, "[a]mong other things." Z.B. further testified:

> There were mentions of the fact that [C.H.] should be encouraged to embellish her testimony as it would look good for Dr. Geiger especially coming up on his medical board hearings because they wanted to lay the blame for everything on [Bressi].

Z.B. also testified that his investigation into the emails revealed:

> A continual pattern on the part of [R.G., Dr. Geiger, and his wife] to box out Dr. Bressi starting in '13. In '13, and I now have this as other lawyers have been

forced to turn over their records, there was a concerted effort to first get rid of Dr. Bressi, and I'm not here to comment on that at all, just that there was a concerted effort to get him out.

And then it was discovered that they would have to pay Dr. Bressi for his shares, they all just said we're not going to do it because he is going to jail forever and guys in jail can't sue us.

Z.B. testified that the emails dated back to 2012, when an investor was negotiating the purchase of Bressi's shares of the business. In 2013, however, a "shift" occurred in the emails, whereby Dr. Geiger simply said: "[W]ait a second; Bressi is under arrest; he is going on trial; why do I need to sell this; I can keep 100 percent for myself."

{¶11} The State argues that the emails were never produced nor authenticated at the hearing, which is a prerequisite to admissibility. "Before evidence may be admitted, it must be authenticated or identified sufficiently 'to support a finding that the matter in question is what its proponent claims.'" *State v. Hoffmeyer*, 9th Dist. Summit No. 27065, 2014-Ohio-3578, ¶ 18, quoting Evid.R. 901(A). The threshold for admissibility is low, however, and Evid.R. 901(B) provides a nonexhaustive list illustrating the ways in which the proponent of the admission of evidence can conform with Evid.R. 901(A). *State v. Yuschak*, 9th Dist. Medina No. 15CA0055-M, 2016-Ohio-8507, ¶ 17. For example, the authentication or identification of evidence may be achieved through the testimony of a witness with knowledge that "'a matter is what it is claimed to be.'" *Id.*, quoting Evid.R. 901(B)(1). Here, Z.B. testified that, in his capacity as receiver in a related civil case, he received these emails directly from R.G.'s attorneys. Z.B.'s testimony is sufficient to satisfy Bressi's burden to demonstrate a reasonable likelihood the over 20,000 emails are authentic. *See Hoffmeyer* at ¶ 18.

{¶12} The State argues in the alternative that even if the emails had been admitted, both Z.B.'s testimony and the emails contained inadmissible hearsay. *See* Evid.R. 801(C) (defining

"hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); Evid.R. 802 (noting the general inadmissibility of hearsay); *but see* Evid.R. 803 and 804 (listing multiple exceptions to the hearsay rule). "[T]o prove that a new trial is warranted on the basis of newly discovered evidence, such evidence must be admissible in the new trial." *State v. Vess*, 6th Dist. Ottawa No. OT-10-038, 2011-Ohio-3118, ¶ 38, citing *State v. Williams*, 43 Ohio St.2d 88 (1975), paragraph one of the syllabus. In rejecting the State's hearsay argument, the trial court noted in its order: "[T]here are a number of ways in which the emails and other communications can be introduced into evidence in Bressi's case-in-chief or for impeachment purposes." The State now argues that the trial court erred in considering the admissibility of the evidence at a new trial. But, the court needed to consider the admissibility of the newly discovered evidence at a new trial, and we therefore cannot say that it erred in doing so. *See id.* We determine that the trial court acted within its discretion in reaching its conclusions as to the admissibility of the evidence. *See State v. Henning*, 9th Dist. Summit No. 29128, 2019-Ohio-2200, ¶ 17 ("Admissibility determinations under the evidentiary rules generally fall within the sound discretion of the trial court.").

{¶13} The State also cites to our decision in *State v. Holmes* and argues that affidavits and unverified emails replete with hearsay will not satisfy the defendant's burden to demonstrate a strong probability that the evidence would change the result of a new trial. *See State v. Holmes*, 9th Dist. Lorain No. 05CA008711, 2006-Ohio-1310, ¶ 14-15. We find *Holmes* to be factually distinguishable from Bressi's case, however, as the motion for a new trial in *Holmes* was supported only by Holmes' own self-serving affidavit, which was largely based on hearsay and unverified documents, e.g., handwritten notes allegedly written by prosecutors and letters purportedly written by his now deceased wife/victim claiming Holmes was innocent and that her

trial testimony was coerced by prosecutors. *See id.* at ¶ 5-6, 14-15. We therefore determined, based on the particular facts in *Holmes*, that "the trial court could have reasonably determined that the evidence submitted did not create a strong probability that it would change the result if a new trial was granted." *Id.* at ¶ 15. Here, Bressi submitted more than his own self-serving affidavit and handwritten notes of unknown origins. Bressi submitted multiple affidavits from various individuals and offered the testimony of the receiver in his civil case, who testified regarding over 20,000 emails he personally received in his capacity as receiver from the attorneys of one of Bressi's partners. The State's reliance on *Holmes* is thus misplaced.

{¶14} Apart from Z.B.'s testimony regarding his investigation of the emails, the trial court noted that Bressi offered four affidavits from A.N., P.S., A.C., and J.N. in support of his motion for a new trial, and the State offered one affidavit from the victim of Bressi's sexual imposition conviction ("C.H.").

{¶15} A.N. is a former patient of Summit Pain Specialists ("Summit Pain") who averred that C.H. called her in 2013 and asked her to contact the Stow Police Department to "implicate Dr. Bressi in inappropriate behavior." C.H. purportedly became upset when A.N. "told her it was not true" and later called A.N. again to ask if she had contacted the police yet. C.H. became upset once more when A.N. said she had not contacted the police, and "ultimately had [A.N.] discharged as a patient from Summit Pain * * * in retaliation * * *." A.N. averred that she had C.H. on speakerphone for the first phone call, and K.D.[1] overheard the conversation. C.H. averred, however, that she had no recollection of A.N. or K.D. and never telephoned or asked anyone to implicate Bressi in any inappropriate behavior. C.H. averred that she received calls

---

[1] An unsworn statement from K.D. that was attached to Bressi's motion for leave was stricken from the record at the August 8, 2017, hearing and was, consequently, not considered by the trial court.

from individuals complaining about inappropriate behavior by Bressi, but told those individuals they had two choices: "not do anything or report to Stow Police." C.H. further averred that she told these people she would have to "report this to Dr. Geiger."

{¶16} Although the trial court's order granting Bressi's motion for a new trial acknowledges P.S.' affidavit, we note that the court explained at the August 8, 2017, hearing it would not consider P.S.' affidavit as newly discovered evidence because she had been on Bressi's May 29, 2014, witness list for trial. The State argues that the trial court erred in relying on P.S.' affidavit nonetheless, but apart from listing the affidavits "offer[ed]" by Bressi nothing further in the court's order indicates any specific reliance on P.S.' affidavit.

{¶17} A.C. averred that she worked at Summit Pain from September 2012 until 2016, and currently works part-time assisting Z.B. She averred that C.H. was "continually in closed door meetings with Dr. Geiger and [R.G.]" prior to and after Bressi's departure from Summit Pain. A.C. averred that, following Bressi's trial, she was present at Summit Pain when C.H. said, "I can't believe the jury believed me." In responding to A.C.'s affidavit, C.H. averred that it was "true, there were discussions behind closed doors that involved may (sic) aspects of [Summit Pain]." In its order, the trial court specifically noted that C.H., in her affidavit, did not deny making the comment: "I can't believe the jury believed me."

{¶18} C.H. further averred that her testimony at Bressi's trial was truthful and she was never contacted by anyone who asked her to "embellish or alter [her] statement or testimony concerning James Bressi." We previously summarized C.H.'s testimony at trial as follows:

> C.H. testified that she worked at Summit Pain Specialists for a total of about fourteen years. In January 2012, she accepted a position at the Stow location with Bressi. C.H. testified that she was familiar with Bressi because she previously had worked with him at a different office. She stated that, after she accepted her position at the Stow office, she worked as a triage nurse and was typically in the office from 7:30 a.m. until 4:30 p.m. One day in March or April 2012, C.H.

stayed late at the office to finish returning phone calls. When she finished, she went to say goodbye to Bressi and he asked how she was doing. C.H. testified that Bressi was aware that she was emotionally fragile at the time because he knew her son had died the previous year and he knew she was scheduled to have a heart catheterization performed. She testified that, when she told Bressi she did not care what happened to her, he asked her to come back to one of the office visit rooms.

C.H. stated that Bressi closed the examination room door behind her and had her lie face down on the examination table. He then started massaging her back and shoulders. C.H. indicated that, when she lay down on the table, she placed her arms at her sides with her palms facing up. As Bressi massaged C.H., she began to feel his penis rubbing in her palm. C.H. testified that she attempted to stop the connection by placing her hands up over her head, but Bressi then took her arms, moved them back down to her sides, and continued to rub his penis against her hand. C.H. then tried again to move her arms, and Bressi once again moved them back into position, rubbing his penis against her. At that point, C.H. testified that she fisted both of her hands. Bressi then brought her left arm out to the side, massaged her hand until she opened it, and placed it back down on her side. He continued rubbing farther down her back until he reached the top of her pants and "scooted [them] down."

C.H. testified that Bressi began "touching at [her] vaginal area," so she immediately told him that his touch was too personal. After she did so, Bressi stopped touching her near her vagina, but told her that "it wasn't for him," but for her because she "needed the release." C.H. testified that she had received OMTs from Bressi in the past, but they never involved him placing his fingers near her vagina or rubbing his penis on her. She testified that she began crying on the examination table and, while she continued to cry, Bressi had her roll onto her back. Bressi then performed several adjustments before C.H. told him that she needed to go. C.H. got down from the table and left the room. She testified that Bressi left the building with her and spoke to her as they were crossing the parking lot. According to C.H., Bressi told her that she needed to go home because she and her husband "needed to f* * * [their] brains out."

C.H. testified that she continued to work at Summit Pain Specialists after her encounter with Bressi because she could not afford to leave her job and similar nursing positions were not readily available. She testified that she waited two weeks to tell her husband what had happened because she was afraid of how he would react. Meanwhile, a few days after the incident, she told Dr. Geiger what Bressi had done. According to C.H., Dr. Geiger told her that she "had his backing" if she chose to contact the police, but that it was her decision to make. She testified that, following her disclosure to Dr. Geiger, a new office policy was put into effect. Per the policy, no medical massages were to be performed and no OMTs were to be performed without another employee being present in the room. C.H. testified that she never intended to report Bressi to the police, but the police

later contacted her while investigating Bressi. She then met with the police and gave a written statement.

*Bressi*, 2016-Ohio-5211, at ¶ 27-30.

{¶19} J.N. averred that she was present with her daughter ("A.N.") and her daughter's friend ("C.D.[2]") when A.N. received a phone call from C.H., which was on speakerphone. She averred that C.H. asked A.N. during the phone call to "implicate Dr. Bressi in inappropriate behavior and to contact Detective Swanson of the Stow Police Department." J.N. averred that C.H. became upset when A.N. "said this wasn't true and would not do so." She averred that A.N. was discharged from Summit Pain shortly thereafter, "which began her downward spiral." In response, C.H. averred that she had no recollection of J.N.

{¶20} In granting Bressi's motion for leave to file a motion for a new trial, the trial court determined that Bressi's new evidence satisfied the second and third *Petro* prongs, i.e., the evidence has been discovered since the trial and is such that it could not have been, in the exercise of due diligence, discovered before the trial. *See Holmes*, 2006-Ohio-1310, at ¶ 11 ("Crim.R. 33(B) calls for an initial determination that there was unavoidable delay."). The State argues that because the names of all of Bressi's patients were in his files, he could not establish that he was unable to discover the evidence from A.C., J.N., and A.N. prior to trial if he indeed exercised due diligence. "If a defendant could have discovered and produced evidence for trial, then that evidence is not the proper subject of a motion filed under Crim.R. 33(A)(6)." *State v. Prade*, 9th Dist. Summit No. 28193, 2018-Ohio-3551, ¶ 52.

---

[2] C.D., as named in J.N.'s affidavit, appears to be the same person as K.D., as listed in A.N.'s affidavit. The two names are almost identical, except for the spelling of the person's first name.

{¶21} The trial court, however, was presented with evidence that Bressi maintained a client base of over 12,000 patients and paid an investigative firm approximately $30,000.00 to review and investigate claims and witnesses. Despite an extensive investigation, Bressi presented evidence that it was not feasible to interview over 12,000 individuals and, consequently, certain patients were not identified as possible victims before his trial was concluded. Z.B. also testified that the over 20,000 emails he reviewed were previously protected by attorney-client privilege and, thus, inaccessible until sometime after Bressi's criminal trial. Thus, we cannot say that the trial court erred in determining that the new evidence was discovered after Bressi's trial and could not have been, in the exercise of due diligence, discovered before the trial.

{¶22} The State next argues that the trial court abused its discretion in finding that the new evidence was material to the issues, as the issue during trial was Bressi's sexual imposition of C.H., not whether Bressi's business partners wanted him out of their practice. This Court disagrees, however, as evidence that a plan or conspiracy was hatched among Bressi's partners to have C.H. embellish or fabricate testimony against Bressi so they could obtain Bressi's shares of the business without paying him is highly relevant to the issue of whether Bressi's contact with C.H. during the OMT rose to the level of criminal activity.

{¶23} The State also argues that the trial court abused its discretion in finding that Bressi's new evidence was not merely cumulative to former evidence. The State directs us to the fact that Bressi testified at trial that he believed the charges against him were the result of a conspiracy promulgated by his Summit Pain partners in an attempt to force him out of the practice. As such, the State contends that the new evidence merely confirms the version of

events Bressi presented to the jury, in which his partners were trying to "buy out" and then "box out" Bressi.

{¶24} However, we see no error in the trial court's determination that Bressi's newly discovered evidence is not merely cumulative to the evidence he presented at trial. Bressi testified at trial that he was being secretly watched without his knowledge or permission to see if he was doing anything inappropriate, which occurred at the behest of both Dr. Geiger and a law firm that had represented Summit Pain in the past. He thus surmised that Dr. Geiger was conspiring to oust him from their practice, and likewise testified that he "believe[d] Dr. Geiger had talked to [C.H.] and [had given] her a heads-up about possibly [his] manipulation techniques not being above board." *Bressi*, 2016-Ohio-5211, at ¶ 41.

{¶25} At the August 8, 2017, hearing, Z.B. testified as to voluminous, previously unavailable emails between Bressi's partners discussing ousting him from the practice without paying him for his shares and discussing having C.H. embellish her testimony against Bressi. The affidavits Bressi attached to his motion also provided new evidence that C.H. was involved in closed door meetings with Bressi's partners and allegedly urged another individual to contact the police to implicate Bressi in inappropriate behavior. A.C.'s affidavit provided new evidence that C.H. told others at Summit Pain, "I can't believe the jury believed me" sometime after Bressi's trial, which C.H. chose not to deny in her own affidavit. Email and affidavit evidence of Bressi's partners' and C.H.'s motivations and involvement in a conspiracy to falsely implicate Bressi in criminal actions, as well as evidence of C.H.'s post-trial remarks, goes well beyond what was available and offered through Bressi's opinion testimony at trial. *See, e.g., State v. Knoefel*, 11th Dist. Lake No. 2017-L-150, 2019-Ohio-267, ¶ 63 (Westcott Rice, J., concurring in part and dissenting in part). We therefore cannot say that the trial court abused its discretion in

determining that Bressi's newly discovered evidence is not "merely cumulative," as it instead provides a "much stronger foundation" for Bressi's personal belief that he was conspired against, and is "different, in kind and character" from the evidence he presented at trial. *See State v. Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604, ¶ 35.

{¶26} The State further argues that the trial court abused its discretion in determining that Bressi's new evidence does not merely impeach or contradict former evidence and further discloses a strong probability that it will change the result if a new trial is granted. A Crim.R. 33 motion for a new trial must demonstrate the strong probability that newly discovered evidence would have led to a verdict of not guilty. *Prade* at ¶ 30. The "mere possibility" that a new trial might lead to a different outcome is not a sufficient basis upon which to grant a motion for a new trial. *Id.* at ¶ 41. It is important to note that "[e]vidence that impeaches or contradicts the evidence at trial is not excluded from consideration per se, but the character of that evidence is relevant to whether a different result is a strong probability." *Jalowiec*, 2015-Ohio-5042, at ¶ 38. "[T]he nature of such evidence requires that a trial court exercise circumspection in determining whether newly discovered evidence of that character would create a strong probability of a different result, because such evidence quite often will not be likely to change the outcome." *Id.*, quoting *Dayton v. Martin*, 43 Ohio App.3d 87, 90 (2d Dist.1987).

{¶27} The trial court found that Bressi's new evidence does not merely impeach or contradict; rather, it presents a "different version of the events." At trial, the State presented testimony from Summit Pain employees regarding Bressi's noticeable change in appearance beginning in 2011 and 2012. Bressi's hygiene was now suffering as he wore wrinkled and unclean clothes, failed to keep his hands clean, and appeared disheveled and more irritable than usual. *See Bressi*, 2016-Ohio-5211, at ¶ 31-32. Moreover, a new written office policy was

instituted regarding Bressi and his female patients, which required a female chaperone to be present when an OMT was performed on a female. *See id.* at ¶ 32. The jury also heard evidence that Bressi was terminated from Summit Pain for violating the chaperone policy and for sexually abusing patients. *See id.* at ¶ 33, 36.

{¶28} The trial court determined that this evidence stood in "stark contrast" to the evidence presented at the August 8, 2017, hearing and in Bressi's motion for a new trial, whereby "significant malfeasance" was occurring at Summit Pain involving undocumented distributions, the destruction of documents and financial records, and a conspiracy to "box [Bressi] out" without paying him while having C.H. embellish her allegations of criminal conduct. The court found this to be a "substantial change in the underlying facts of the case," as the jury was never presented with any evidence indicating criminal or fraudulent actions by Bressi's partners or a conspiracy to "frame" him for sexual assault. The court determined that Bressi's new evidence not only corroborated his trial testimony that someone else may have caused C.H. to believe Bressi's contact with her during the OMT was inappropriate, but also revealed "a criminal conspiracy against Bressi perpetrated by the owners of [Summit Pain] and C.H." The court further found that the new evidence "reveals significant credibility issues for C.H., whose testimony as a victim was essential in supporting the only conviction against Bressi * * *." Given that Bressi never denied performing the OMT on C.H., and his trial testimony was largely consistent with C.H.'s testimony as to the basic facts of that particular incident, the trial court ultimately found that there was a strong probability this newly discovered evidence would change the result of a new trial.

{¶29} We cannot agree with the State's argument that the trial court abused its discretion in reaching its conclusions here. C.H. was undoubtedly the State's key witness in

Bressi's lone conviction for sexual imposition, and she testified in graphic detail regarding Bressi's alleged criminal behavior during the OMT. *See Bressi*, 2016-Ohio-5211, at ¶ 27-30. Bressi did testify at trial as to a possible conspiracy against him and his belief that Dr. Geiger may have given C.H. a "heads-up" that Bressi's OMT techniques were not "above board," but no evidence of this possible conspiracy beyond Bressi's own speculation was presented to the jury. *See id.* at ¶ 41. While the State argues that evidence C.H. embellished or fabricated her allegations would merely impeach her trial testimony, "'newly discovered evidence impeaching key testimony may alone be sufficient to grant a new trial if introduction of the evidence at trial probably would have changed the result.'" *State v. Fortson*, 9th Dist. Summit No. 18513, 1998 WL 224941, *3 (May 6, 1998), quoting *State v. Brumback*, 109 Ohio App.3d 65, 85-86 (9th Dist.1996). *See also State v. Robertson*, 1st Dist. Hamilton No. C-160681, 2017-Ohio-7225, ¶ 23-24 (determining that testimony supporting a motion for a new trial presenting a different version of events from that offered by the State at trial, which calls into question the only testimony identifying the defendant as the perpetrator, is "more than merely impeaching or contradictory to the evidence presented at trial.").

{¶30} Upon careful review of the record in this matter, this Court cannot conclude that the trial court abused its discretion in determining that Bressi's newly discovered evidence satisfied all six *Petro* factors. The trial court's decision is not unreasonable, i.e., lacking a sound reasoning process supporting it, nor is it arbitrary or unconscionable. *See AAAA Ents.*, 50 Ohio St.3d at 161; *Blakemore*, 5 Ohio St.3d at 219. Bearing in mind the highly deferential standard of review applicable in this matter, we must conclude that the trial court acted within its sound discretion in granting Bressi's motion for a new trial.

{¶31} The State's sole assignment of error is overruled.

III.

**{¶32}** The State's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellant.

MICHAEL T. CALLAHAN, Attorney at Law, for Appellee.