[Cite as *State v. Carter*, 2024-Ohio-5193.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | | C.A. No.    30848 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| TAVIEN CARTER | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No.    CR-2020-01-0340 |

DECISION AND JOURNAL ENTRY

Dated: October 30, 2024

STEVENSON, Presiding Judge.

{¶1}    Defendant-Appellant Tavien Carter appeals the judgments of the Summit County Court of Common Pleas that found him guilty of aggravated robbery with a three-year firearm specification and grand theft of a motor vehicle, and denied his motion for a new trial. This Court affirms.

I.

{¶2}    In February 2020, Mr. Carter was indicted on one count of aggravated robbery in violation of R.C. 2911.01(A)(1)(C), a felony of the first degree, with an attendant firearm specification under R.C. 2941.145(A), and one count of grand theft of a motor vehicle in violation of R.C. 2913.02(A)(5)(B)(5), a felony of the fourth degree. The charges arose from an incident that took place on October 16, 2019. The victim in this matter is M.C. As will be explained below, M.C. alleged that Mr. Carter stole his vehicle at gunpoint, whereas Mr. Carter maintains that M.C. gave him permission to take the vehicle in exchange for drugs.

**{¶3}** Mr. Carter pleaded not guilty to the charges and the matter proceeded to a jury trial in January 2023. The jury found Mr. Carter guilty on both counts and the firearm specification. Mr. Carter moved for a new trial based on newly discovered evidence. Attached to the motion was the affidavit of S.J., M.C.'s cousin, asserting that M.C. lied at trial. The State responded and submitted an opposing affidavit from M.C. The trial court held a hearing on the motion and S.J. testified. After the hearing, the trial court denied the motion.

**{¶4}** Mr. Carter was sentenced to an aggregate indefinite prison term of 13 to 18 years. He timely appealed and asserts two assignments of error for our review.

II.

### ASSIGNMENT OF ERROR I

**THE JURY IMPANELED BY THE TRIAL COURT ERRED IN FINDING [MR. CARTER] GUILTY OF THE CHARGES AGAINST HIM AS THE CONVICTIONS WERE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.**

**{¶5}** When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction." *State v. Croghan*, 2019-Ohio-3970, ¶ 26 (9th Dist.).

**{¶6}** It is well-established that "a trier of fact enjoys the best position to assess the credibility of witnesses." *State v. Tyus*, 2020-Ohio-4455, ¶ 57 (9th Dist.). *See also Prince v. Jordan*, 2004-Ohio-7184, ¶ 35 (9th Dist.) ("the jury is free to believe all, part, or none of the testimony of each witness."). This Court "'will not overturn a conviction as being against the

manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version.'" *State v. Tolliver*, 2017-Ohio-4214, ¶ 15 (9th Dist.), quoting *State v. Barger*, 2016-Ohio-443, ¶ 29 (9th Dist.).

{¶7}   Aggravated robbery is prohibited under R.C. 2911.01 which provides:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

. . .

(C) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.

. . .

{¶8}   R.C. 2913.02(A)(5) and (B)(5) prohibit grand theft of a motor vehicle and provide as follows:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

. . .

(5) By intimidation.

. . .

[(B)](5) If the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle, a felony of the fourth degree.

. . .

{¶9}   At trial, the State presented testimony from the following individuals: the victim M.C., M.C.'s fiancé M.P., Akron Police Officers Stephen Vari, Alexander McGarvey, Matthew Eckart, and Benjamin Surblis, and Heather Bizub from the Ohio Bureau of Criminal Investigation

("BCI"). The State also introduced into evidence the 911 call made by M.C., the body worn camera footage from Officer Vari who responded to the 911 call, and the video footage from Officer Surblis' interview with Mr. Carter. The defense presented the testimony of Mr. Carter and four others: W.B., K.W., J.R., and A.W. The parties have two completely divergent stories about what happened on October 16, 2019.

{¶10} The State's testimony and evidence reflected the following. M.C. is a 60-year-old black male. He testified that on the day in question, he was living in Cuyahoga Falls with his fiancé, M.P., and their 19-year-old daughter. M.C. had been disabled for 10 years due to a head injury and depended on M.P. for rides. He did not have a driver's license. He stated that he had been "clean" from cocaine for "over 15 years" with no relapses. M.P. owned a 2005 Kia Sedona van ("Kia"). M.C. borrowed the Kia that day to visit his sister and cousin in West Akron. He left his home around 2:00 p.m. During those visits he had a few beers. While on his way home around 6:00 p.m., M.C. came to the stop sign at the corner of Wildwood Avenue and Work Drive in Akron when a black car suddenly tapped his back bumper. M.C. immediately got out of the Kia and a "big dude" got out of the driver's side of the black car. The "big dude" pointed a gun at M.C.'s face and said, "[w]here your money at?" and "[b]itch, you know what it is." M.C. described the man as a "heavyset dude with dreads" and wearing a "black hoodie[.]" M.C. later identified this man through police photographs as Mr. Carter.

{¶11} At the same time, a "slim dude" got out of the passenger side of the same car. According to M.C., Mr. Carter then "jumped in [the Kia] and took off onto Work Drive." M.C. claimed he had never seen Mr. Carter before, not "a day of my life." M.C.'s wallet, car keys, Florida State ID, and bank card were inside the Kia when Mr. Carter drove off with it. The "slim

dude" got in the black car and followed Mr. Carter. M.C.'s mobile phone had lost battery, so he walked two blocks to a friend's house on Whittier Drive and immediately called 911.

{¶12} The 911 call was played for the jury. In it, M.C. is heard telling the operator that he was at 959 Whittier Drive, and that he had just gotten robbed. He explained that he was on his way home on Work Drive when a black car bumped him from behind. M.C. then said he got out of his vehicle and at the same time a man got out of the black car, pulled a gun on him and said "you want to die for this shit?" M.C. told the operator, "he took my van." M.C. identified the location of the theft as the corner of Work Drive and Wildwood. He said the man was a "black guy," "kinda chubby," "had dreads," and was wearing a gray hoodie. M.C. proceeded to answer the operator's questions about the description of the Kia, including its make, model, color, and license plate number. He further stated that his wallet and keys to his house were in the van. He said he was "so doggone scared" that he did not get a close look at the gun. He described himself to the operator as "shook up a lot."

{¶13} Officer Vari responded to M.C.'s 911 call at 6:42 p.m. at the house on Whittier Drive. Officer Vari described the conditions as "still daylight, but . . . getting to be dark." The body-worn camera footage of his interaction with M.C. was played for the jury. The video footage shows M.C. standing in the doorway of the front porch explaining to Officer Vari what had happened. He gave the same account to Officer Vari as he did to the 911 operator about what happened. M.C. described the man who stole his vehicle as a black male in his 20's with "dreads[,]" a lazy eye, and wearing a gray hoodie. He repeated that the man told him "you want to die for this?" Officer Vari then issued a "be on the lookout" alert regarding the stolen vehicle.

{¶14} At approximately 2:00 a.m. on October 17, 2019, Office McGarvey came across the Kia in the driveway at 420 Hillwood Drive, about a quarter of a mile from the location of the

theft. The Kia was towed to the police evidence garage, and Detective Eckart took DNA samples from the steering wheel, gear shifter, and door handles. Through the testimony of Heather Bizub from BCI, the State presented evidence that the samples contained Mr. Carter's DNA.

{¶15} When the Kia was returned to M.C., he noticed that his bank card was missing, and that there was a brown paper bag present that did not belong to him which contained someone else's mail. His wallet and ID were in the vehicle. Also, the driver's side car seat was leaned "way back" as if for a very tall person. M.C. testified that he and M.P. did not sit like that. The Kia also had a dent on the back left side.

{¶16} Detective Surblis was assigned to investigate the incident. As part of the investigation, he interviewed M.C. while M.C. was still at 959 Whittier Drive, not long after M.C. spoke to Officer Vari. Based on his observation of M.C.'s demeanor, Detective Surblis concluded that "it was obvious that [M.C.] was upset" and "visibly shaken[.]" Detective Surblis also said that M.C. did not appear to be impaired by drugs or alcohol. He noted that "crack cocaine acts as a stimulant on the system" which renders a person "jumpy, fidgeting, not able to sit still, they speak rapidly" and that he did not recall M.C. showing any of those traits during the interview. Later during the investigation, after finding out that Mr. Carter's DNA had been found in the Kia, Detective Surblis ran a search for Mr. Carter in the Ohio Law Enforcement Gateway system, and the results matched the same physical build that M.C. described to the patrol officers. Based on that information, Detective Surblis went to M.C.'s house in Cuyahoga Falls and showed him a photograph of Mr. Carter. M.C. identified Mr. Carter as the one who pointed the gun at him and took his car.

{¶17} M.P. testified that she had never witnessed M.C. on drugs and could not recall that he ever used drugs. She was not aware that M.C. had ever consumed any mind-altering substances other than beer. She denied having any knowledge of M.C.'s past drug use.

{¶18} The video footage of Detective Surblis's interview with Mr. Carter after his arrest reflects that Mr. Carter denied knowing M.C., denied being in the Kia, and denied having any part of the robbery and theft. He claimed that he does not drive because he does not have a valid driver's license, and had no idea how his DNA was found in the Kia.

{¶19} In the defense's case, Mr. Carter testified that he makes his living as a drug dealer and sells drugs to 20-30 people per day. He also admitted that he spent two years in prison for a carrying a concealed weapon conviction. He testified that on October 16, 2019, he sold drugs to M.C. on three separate occasions at a parking lot located at the corner of Gale and Crosby streets in West Akron. He identified that location as a known high drug area. He testified that on the third occasion, which occurred at approximately 6:00 p.m., M.C. did not have the money to pay him, so M.C. offered Mr. Carter the keys to the Kia on a temporary basis. After driving the vehicle around for a while, Mr. Carter abandoned it in the driveway of the Hillwood Avenue residence because he realized it was too risky for a convicted felon with drugs in his vehicle and no driver's license to be driving on empty roads at 2:00 a.m. Mr. Carter's testimony contradicted his statement to the police that he had not been in the Kia and did not know M.C. When asked about that inconsistency on cross-examination, he explained that he did not tell the truth to the police about what really happened because he lived a life of crime and did not want to admit to a drug trafficking offense.

{¶20} W.B. testified in Mr. Carter's defense. W.B. testified that he had known Mr. Carter for several months prior to October 16, 2019, and had seen him sell drugs in the parking lot at Gale and Crosby. He testified that "over four to five years ago[,]" when it was "fair weather" outside,

he saw Mr. Carter speaking with a black male six feet two inches tall and weighing 220-230 pounds, and that the black male was with another individual named D.P. He saw Mr. Carter give the black male drugs and take keys in exchange. When asked if this occurred on October 16, 2019, he answered, "I don't actually know what - - I can't actually remember it that exact date . . . . You know, I don't - - I can't actually remember that exact date of what happened."

{¶21} K.W., Mr. Carter's girlfriend, also testified in Mr. Carter's defense. When asked about what happened on October 16, 2019, she said that date did not ring a bell. She could only say that sometime in the middle of October, she saw D.P. and "someone else" in the parking lot at Gale and Crosby, and that Mr. Carter gave the unknown man drugs, then got into a vehicle and drove away. She could not remember the exact date this occurred. She further testified that she saw the unknown man get drugs from Mr. Carter earlier that day and that he paid cash. She said Mr. Carter was in the same vehicle that he took from the unknown man when she saw him later that day. K.W. has a criminal record that includes convictions for disorderly conduct and petty theft.

{¶22} J.R. also testified in Mr. Carter's defense. J.R. admitted that he "had an extensive crack habit" and bought drugs "just about every day" in the parking lot at Gale and Crosby. He testified that sometime in the middle of October 2019 he was in his car and engaged in a drug transaction with Mr. Carter at the lot on Gale and Crosby when D.P. and another man drove up and parked behind him. J.R. described this other man as "dark black; he's darker complexion" and six feet one to two inches tall. He testified that he heard this other man say that he did not have any money but that he had a car. J.R. later met Mr. Carter and Mr. Carter was in the same vehicle that the two men were driving when they parked behind him earlier. On cross-examination, he

said that he had no idea if that transaction was the same incident that was the subject of Mr. Carter's present case. He further testified that he was high on drugs at the time.

{¶23} A.W. also testified for Mr. Carter. At the time of trial, A.W. was in custody at the Summit County Jail. He admitted to having a criminal background that included an F-2 burglary charge and stated that he had been "back and forth to prison over the last few years." He identified the intersection of Gale and Crosby as a high drug area and said he had been there off and on in the past. He was arrested there in October 2022 after relapsing and getting back on drugs. A.W. said he knew Mr. Carter from having bought drugs from him numerous times. When A.W. was shown a photograph of M.C., he said he recognized him and had seen him at the lot on Gale and Crosby, but did not know his name. When asked on direct examination if he recalled the date of October 16, 2019, he answered that "I can't say I remember that [] date." He was asked again on cross-examination whether it was a "fair statement" that he was not testifying about "anything that [] happened on October 16, 2019[,]" and he responded "Yes, ma'am."

{¶24} Mr. Carter argues on appeal that his version of what took place on October 16, 2019, is the most plausible and realistic version, and that it was clear based on common sense that M.C. was not being truthful. He maintains that M.C. fabricated the robbery and vehicle theft story to cover his quest to obtain cocaine during a binge, and that he was desperate to provide an excuse to M.P. about what happened to her vehicle because he had hidden his cocaine addiction from her for years and needed to maintain the deception. Mr. Carter asserts that the jury lost its way in believing M.C.'s preposterous story that he was robbed at gunpoint. He contends that in order to believe M.C.'s story, the jury would have to accept that M.C. had been drug free for 15 years; that Mr. Carter knew M.C. had money in the Kia; that Mr. Carter did not check M.C.'s pockets for

money; that M.C.'s wallet was recovered; that all of Mr. Carter's witnesses are lying; and that Mr. Carter, a convicted felon, stole a vehicle in broad daylight while armed with a gun.

{¶25} The State argues that Mr. Carter's story is not plausible because: (1) Mr. Carter's trial testimony was entirely different from his initial police interview, which therefore makes any of his accounts about the car theft suspicious; (2) Mr. Carter's version of the events is based on the premise that M.C. was on a drug binge, yet M.P. denied that M.C. was under the influence, Detective Surblis was unable to detect any impairment, and there was no indication that M.C. was impaired in the 911 call or body camera footage of his initial encounter with the police; (3) it is unreasonable to conclude that M.C. would have voluntarily given the Kia to Mr. Carter and at the same time leave his wallet, bank card, and ID behind, or that he could have concocted an elaborate plot that included a fictitious 911 call, initial police statements, a positive identification of Mr. Carter in a subsequent interview, and testimony under oath that was corroborated by DNA evidence; and (4) the testimony of Mr. Carter's witnesses was significantly undermined based on their lack of knowledge about the events of October 16, 2019.

{¶26} The jury heard the testimony and evidence from both sides. The jury listened to the 911 call, watched Officer Vari's body camera video, and viewed the footage of Detective Surblis's interview with Mr. Carter. The jury was free to disbelieve Mr. Carter's evidence that M.C. fabricated the robbery and theft to cover for his cocaine addiction and that M.C. gave Mr. Carter the keys to his vehicle in exchange for cocaine because he had run out of money. Similarly, the jury was free to believe the State's evidence that Mr. Carter robbed M.C. at gunpoint and stole his van, car keys, wallet, ID, and bank card. As the State pointed out, none of Mr. Carter's witnesses could identify M.C. as the individual that exchanged drugs for his vehicle on the exact date of October 16, 2019. They all referred to an unidentified man who bought drugs from Mr.

Carter sometime in October 2019. Also, Mr. Carter admittedly lied in his interview with Detective Surblis when he could have simply said that M.C. gave him permission to use the Kia without mentioning anything about drugs. The jury could have concluded that if Mr. Carter lied to the police to avoid implicating himself, he might also be lying in his testimony to avoid another conviction. Conversely, M.C.'s story was consistent throughout the case, including the 911 call, his initial statement to the police, his interview with Detective Surblis, his identification of Mr. Carter, and his testimony.

**{¶27}** Upon our thorough review of the entire record, we cannot conclude that the jury, in resolving any conflicts in the evidence, clearly lost its way and created a manifest miscarriage of justice requiring a reversal of Mr. Carter's convictions. *See Otten*, 33 Ohio App.3d at 340. The jury, as the trier of fact, was in the best position to evaluate the credibility of the testimony and evidence and was free to believe the State's theory of the events and reject Mr. Carter's version. *State v. Shank*, 2013-Ohio-5368, ¶ 29 (9th Dist.). The State presented witnesses and video evidence from which the jury could have reasonably concluded that Mr. Carter committed the crimes of aggravated robbery with a firearm and grand theft of a motor vehicle. Mr. Carter has not shown that this is an exceptional case where the evidence weighs heavily against the conclusion that the State proved beyond a reasonable doubt that he committed the crimes of aggravated robbery and grand theft of a motor vehicle.

**{¶28}** Mr. Carter's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED IN DENYING [MR. CARTER'S] MOTION FOR NEW TRIAL FILED ON FEBRUARY 21, 2023, BY MEANS OF THE JOURNAL ENTRY DATED APRIL 24, 2023, AS THE COURT FAILED TO PROPERLY APPLY THE STANDARD ENUNCIATED BY [CRIM.R.] 33. THE FAILURE TO GRANT A NEW TRIAL MATERIALLY AFFECTED**

**[MR. CARTER'S] SUBSTANTIAL CONSTITUTIONAL RIGHTS AFFORDED UNDER FEDERAL AND STATE LAW.**

{¶29} This Court has consistently held that an appellate court reviews a trial court's ruling on a motion for new trial under an abuse of discretion standard. *State v. Roper*, 2021-Ohio-188, ¶ 8 (9th Dist.), citing *State v. Pyle*, 2018-Ohio-3160, ¶ 47 (9th Dist.). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court." *Roper* at ¶ 8, citing *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1983).

{¶30} Crim.R. 33(A)(6) permits a defendant to move for a new trial "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." The requisites for granting a new trial based upon newly discovered evidence are set forth in *State v. Petro*, 148 Ohio St. 505 (1947), syllabus, which provides:

> To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

{¶31} The *Petro* test is in the conjunctive. Therefore, all six factors must be satisfied to justify granting a motion for new trial.

{¶32} Mr. Carter's motion for new trial included the signed affidavit of M.C.'s cousin, S.J., dated February 21, 2023, which stated in pertinent part:

3. The Affiant states that shortly after the Trial in the instant case, she spoke with [M.C.] and asked him why he lied about giving his vehicle to the Defendant, [Mr. Carter], and the subsequent aggravated robbery charge;

4. The Affiant also states that [M.C.] admitted he did not care about ruining [M.C.'s] life saying, "f*** that n ***r".

5. The Affiant further attests that she was present when [M.C.] used controlled substances within the last year, thus lying under oath at Trial[.]

{¶33} M.C.'s affidavit, which was attached to the State's response, stated as follows in relevant part:

2) [S.J.] was not present for the theft of the Kia Sedona at gunpoint on October 16, 2019.

3) I did receive a phone call from [S.J.] following my testimony at trial….

4) [S.J.] notified me that she was aware of my testimony at trial even though she was not present during my testimony.

5) [S.J.] then asked me why I was lying on her boy Tavien Carter. I told her I was not lying and a brief argument ensued which resulted in me disconnecting the call.

{¶34} The State does not contest that the information contained in S.J.'s affidavit was discovered since the trial and could not have in the exercise of due diligence been discovered before the trial.

{¶35} At the hearing on the motion, S.J. characterized her relationship with M.C. as extremely close their whole lives. She described M.C. as her "ride-or-die" cousin and that they were like "sisters and brothers." She said they used drugs together in 2022, but that M.C. never mentioned the pending trial. She could not remember the last time she had spoken to him prior to the trial. S.J. was not present for the trial and obtained her information about it from "[t]he streets." She was not present for the events on October 16, 2019, and stated she could not say what happened that day. She said that when she spoke to M.C. after the trial, he admitted to still getting high and

that they talked about getting together; however, when she attempted to visit him at his apartment, she could not find it, so she went back home.

{¶36} The trial court issued a written judgment entry denying the motion. The entry is silent as to the court's reasoning. However, in its oral ruling after the hearing the trial judge found that the newly discovered evidence would not disclose a strong probability that would actually change the result of a new trial. She "also [found] it does not meet all six requirements as required by [Rule 33(A)(6)] and as also followed by the Ninth District." Mr. Carter argues that the newly discovered evidence, "[w]hen added to the mix of all relevant evidence its impact creates a very strong probability that the Jury's verdict would not have been for conviction." He contends that the newly discovered evidence "goes directly to the believability of [M.C.'s] statements and claims along with the establishment of a motive for [M.C.'s] deceitful behavior." The State argues that the evidence is cumulative and merely impeaching and that nothing in S.J.'s testimony or affidavit would have likely changed the jury's verdict.

{¶37} Having reviewed S.J.'s affidavit and her testimony at the hearing, we conclude the trial court did not abuse its discretion in denying Mr. Carter's motion as his newly discovered evidence is merely cumulative and impeaches the evidence presented at trial that M.C.'s car was stolen and that he had 15 years of uninterrupted sobriety. Also, the trial court did not abuse its discretion in its oral ruling that the evidence would not likely have changed the outcome of the trial.

{¶38} At trial, Mr. Carter's witnesses testified that an unknown man who Mr. Carter alleged was M.C. bought drugs on or around the day of the robbery. Thus, Mr. Carter's newly discovered evidence, i.e., that M.C. lied about what happened on October 16, 2019, is cumulative of the evidence Mr. Carter presented at trial. To the extent that M.C.'s alleged drug use "within

the last year," meaning the year prior to February 21, 2023, is impeaching of his testimony that he was sober for 15 years, again, the jury heard Mr. Carter and his witnesses testify about M.C.'s alleged drug buys on October 16, 2019, weighed that testimony against the State's evidence that M.C. was not on drugs that day, and decided that the State's evidence was more credible. Thus, the fact of M.C.'s drug use with S.J. "within the last year" is once again cumulative of other impeaching evidence that was already presented to the jury.

{¶39}  Additionally, as S.J. had no personal knowledge about M.C.'s testimony at trial nor as to what took place on October 16, 2019, the trial court reasonably concluded that her affidavit did not "disclose a strong probability that it will change the result if granted." *Petro*, 148 Ohio St. 505, at syllabus.

{¶40}  Based on the foregoing, we cannot say that the trial court abused its discretion when it denied Mr. Carter's motion because Mr. Carter's newly discovered evidence does not meet all of the *Petro* factors outlined *supra*. The trial court's finding that Mr. Carter's motion for new trial did not meet the *Petro* factors is not error because the trial court could have reasonably concluded that the evidence it contained is cumulative, impeaching, and would not have changed the outcome of the trial. Accordingly, Mr. Carter's second assignment of error is overruled.

III.

{¶41}  Accordingly, Mr. Carter's assignments of error are overruled, and the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

CARR, J.
HENSAL, J.
CONCUR.

APPEARANCES:

DAVID M. LOWRY, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.