[Cite as *State v. Hunter*, 2026-Ohio-1744.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

STATE OF OHIO

    Appellee

v.

GEVONTE HUNTER

    Appellant

C.A. No.    31691

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR-2011-11-3220-A

DECISION AND JOURNAL ENTRY

Dated: May 13, 2026

FLAGG LANZINGER, Judge.

{¶1}  Gevonte Hunter appeals from the judgment of the Summit County Court of Common Pleas that denied his fourth motion for a new trial. For the following reasons, this Court affirms.

I.

{¶2}  As this Court previously explained, "[i]n 2012, a jury found Mr. Hunter guilty of aggravated murder, aggravated robbery, and murder, along with four three-year firearm specifications." *State v. Hunter*, 2024-Ohio-4658, ¶ 2 (9th Dist.) ("*Hunter III*"). The convictions stemmed from the 2011 shooting death of S.S. outside a business known as Kelley's Carryout. *State v. Hunter*, 2014-Ohio-910, ¶ 2 (9th Dist.) ("*Hunter I*"). This Court will briefly address the evidence the State presented against Mr. Hunter at trial.

**Mr. Hunter's Trial and Direct Appeal**

{¶3} As this Court acknowledged in *Hunter I*, the evidence the State presented against Mr. Hunter at trial was circumstantial. *Id.* at ¶ 26. No surveillance footage of the shooting existed, and no DNA evidence tied Mr. Hunter to the shooting. *Id.* at ¶ 14, 18.

{¶4} At trial, the State presented evidence indicating that S.S. sold then-illegal marijuana, and that Mr. Hunter and a co-defendant exchanged text messages on the day of the shooting about their plan to "violently rob" S.S. *Id.* at ¶ 16, 26. More specifically, the State presented text messages exchanged between Mr. Hunter's co-defendant and S.S. on the day of the shooting indicating that Mr. Hunter's co-defendant arranged to buy marijuana from S.S. at "kellys[.]" *Id.* at ¶ 19. The State also presented text messages exchanged between Mr. Hunter and his co-defendant indicating that the co-defendant relayed information about S.S.'s car, appearance, and location to Mr. Hunter minutes before the shooting. *Id.* at ¶ 21. In those messages, Mr. Hunter's co-defendant informed Mr. Hunter that S.S. was on his way to "kelly[,]" and instructed Mr. Hunter to "tare em up just hit me up wen u done[.]" *Id.*

{¶5} The State also presented evidence indicating that Mr. Hunter's aunt saw Mr. Hunter being dropped off near Kelley's Carryout about a minute before the shooting, and that the police found Mr. Hunter's cell phone in S.S.'s vehicle after the shooting. *Id.* at ¶ 12, 20, 24. The State further presented evidence from a witness who testified that Mr. Hunter's co-defendant told her that he (the co-defendant) had orchestrated a "'robbery gone bad' . . . targeting '[s]ome Arab'" at Kelley's Carryout. (Alteration in original.) *Id.* at ¶ 22. That witness explained that Mr. Hunter's co-defendant told her that he was "texting some dude telling him what the dude in the car had on, what kind of car he was driving." *Id.* While Mr. Hunter challenged the credibility of the State's witnesses on direct appeal and claimed he lost his cell phone before the shooting (among other

arguments), this Court rejected those arguments on the basis that the jury was in the best position to evaluate the evidence and assess the credibility of the witnesses. *See id.* at ¶ 28.

{¶6}    The trial court sentenced Mr. Hunter to 33 years to life in prison. *Id.* at ¶ 3. This Court affirmed Mr. Hunter's convictions on direct appeal. *Id.* at ¶ 49.

## Mr. Hunter's Motions for a New Trial

{¶7}    In 2020, Mr. Hunter moved for a new trial based on newly discovered evidence. *State v. Hunter*, 2021-Ohio-2020, ¶ 4 (9th Dist.) ("*Hunter II*"). The trial court denied Mr. Hunter's motion, and this Court affirmed the denial on appeal. *Id*. at ¶ 9, 24. In 2022, Mr. Hunter filed a second motion for a new trial, which the trial court denied. *Hunter III*, 2024-Ohio-4658, at ¶ 2 (9th Dist.). "Mr. Hunter appealed, but later voluntarily dismissed the appeal." *Id.*

{¶8}    In 2023, Mr. Hunter filed a motion for leave to file his third motion for a new trial. *Id.* at ¶ 3. This Court previously summarized Mr. Hunter's third motion as follows:

> Mr. Hunter supported this motion with the affidavit of S.B., a fellow inmate incarcerated at Trumbull Correctional Institution, as well as Mr. Hunter's own affidavit. The affidavits indicated Mr. Hunter and S.B. met while in line for the microwave. S.B. and Mr. Hunter began speaking and made a connection regarding the murder at Kelley's Carryout which led to Mr. Hunter's convictions and imprisonment. S.B. attested he was an eyewitness to the murder, and the "shooter and the victim were of Arab descent[,]" and he is "100% certain the shooter was NOT Gevonte Hunter." (Emphasis in original.) S.B. also indicated that because he was 16-years old at the time, his mother would not allow him to come forward with this information. S.B. stated, "I assumed the shooting was caught on camera and the shooter went to prison for it because I knew Kelley's [Carryout] had video [cameras] outside." Mr. Hunter attested he and S.B. did not know each other at the time of the trial, and he was unaware S.B. could be a potential witness prior to May of 2023.

*Id*.

{¶9}    The State opposed Mr. Hunter's third motion, arguing that "Mr. Hunter failed to submit clear and convincing proof he was unavoidably delayed from discovering the information presented in S.B.'s affidavit." *Id*. at ¶ 4. The trial court denied Mr. Hunter's motion for leave to

file a motion for new trial without holding an evidentiary hearing. *Id.* at ¶ 5. This Court affirmed the trial court's denial on appeal. *Id.* at ¶ 11.

{¶10} With leave of court, Mr. Hunter filed a fourth motion for a new trial in 2025 and requested an evidentiary hearing. In support of his motion, Mr. Hunter attached affidavits from his mother, his uncle, and J.E. Mr. Hunter also attached Facebook messages exchanged between his mother and J.E.

{¶11} The Facebook messages reflected that J.E. contacted Mr. Hunter's mother in 2024. In the messages, J.E. explained to Mr. Hunter's mother that he saw her in 2012 when she was looking for witnesses to the shooting at Kelley's Carryout. J.E. explained that he told her at the time that he did not want to get involved. J.E. also explained that a recent interaction with her at his work (KFC) made him realize he wanted to "do what's right" and that he had information he wanted to "get . . . off [his] chest . . . ." Mr. Hunter's mother responded that she would need him to provide an affidavit, which J.E. agreed to provide.

{¶12} In his affidavit, J.E. averred that he witnessed the shooting at Kelley's Carryout and that he was "exposing the truth now for [his] personal peace." J.E. averred:

> 2. I never reported what I saw because I simply did not want to be involved. I did not want to be a witness, I did not want to come to court, I did not want to talk to the police so I chose to remain silent about what I saw.
>
> 3. I don't know [Mr.] Hunter personally, but I did know him at the time as Gino's little brother. In 2012, at Kelley's Drive-Thru I ran into their mother Roxanne who asked me did I have any information about the shooting and I told her I did not know anything about it.
>
> 4. The day of the shooting I momentarily parked at Kelley's to roll a joint, parking next to the victim who was sitting in his car alone as if he was waiting on someone.
>
> 5. The victim got out of his car and began arguing with another man of Arab descent, as I was leaving, stopped at the entrance, I looked back to see the argument escalate to pushing and shoving, then he shot him.

6. I saw a man of Arab descent shoot the victim . . ., that person was not [Mr.] Hunter.

7. I decided to break my silence because I recently seen Roxanne again for the first time with much pain in her eyes. We had no words. She came through the drive-thru at KFC where I work, and I instantly recognized her. Since that day I've felt extremely bad about lying to her and not coming forward.

{¶13} In her affidavit, Mr. Hunter's mother averred that she and her brother went door-to-door after the shooting to try to find anyone with information about the shooting. Mr. Hunter's mother also averred that she and her brother sat in the parking lot of Kelley's Carryout and asked patrons if they had information about the shooting. Mr. Hunter's mother averred that she remembered speaking to J.E. in 2012, and that J.E. told her he did not want to be involved. Mr. Hunter's mother then averred that J.E. contacted her via Facebook in 2024, explaining that he had information he wanted to share with her.

{¶14} In his affidavit, Mr. Hunter's uncle averred that he accompanied his sister on her door-to-door search of the neighborhood for information after the shooting at Kelley's Carryout. Mr. Hunter's uncle also averred that he and his sister sat in the parking lot of Kelley's Carryout and asked patrons if they had any information about the shooting. Mr. Hunter's uncle concluded: "[u]nfortunately, no one came forward and we weren't successful finding any eyewitnesses."

### The Trial Court's Decision

{¶15} The trial court denied Mr. Hunter's fourth motion for a new trial without holding an evidentiary hearing. In doing so, the trial court assessed the credibility of J.E.'s affidavit and concluded "there is not a strong probability that [J.E.'s] testimony, if offered at trial, would change the outcome if a new trial were granted." The trial court explained, in part:

> The question before the Court is simple: Is it plausible to believe that [J.E.], a person acquainted with one of [Mr. Hunter's] close family members, witnessed a person other than [Mr. Hunter] commit a murder but decided to remain silent, for no explicable reason other than lack of interest, for the some 12 years, deciding to

come forward only after a chance encounter with [Mr. Hunter's] mother shortly after [Mr. Hunter's] recent attempt to obtain a new trial had failed? This Court concludes that it is not.

{¶16} Alternatively, the trial court determined that "even putting aside the Court's misgivings about [J.E.'s] credibility, in consideration of all the evidence presented at [Mr. Hunter's] trial, the Court concludes there is not a strong probability that [J.E.'s] testimony would change the result." The trial court then summarized the evidence presented at trial and determined this was not a case in which the "extraordinary measure" of a new trial was justified. Consequently, the trial court concluded that a hearing was not warranted, and denied Mr. Hunter's fourth motion for a new trial.

{¶17} Mr. Hunter now appeals the trial court's decision, raising three assignments of error for this Court's review. To facilitate our analysis, this Court will consider Mr. Hunter's assignments of error out of order.

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT ABUSED ITS DISCRETION AND EMPLOYED AN UNSOUND REASONING PROCESS WHEN IT DENIED APPELLANT[']S MOTION FOR NEW TRIAL WITHOUT HOLDING AN EVIDENTIARY HEARING.**

{¶18} In his second assignment of error, Mr. Hunter argues that the trial court abused its discretion when it denied his fourth motion for a new trial because it failed to properly apply the correct legal standards. For the following reasons, this Court disagrees.

{¶19} Crim.R. 33(A)(6) permits a defendant to move for a new trial "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." A motion for a new trial that alleges newly discovered evidence must be filed within 120 days of the verdict. Crim.R. 33(B). Here, Mr. Hunter moved for—and the trial court granted—leave to file an untimely motion for a new trial. *See id.*

{¶20} "This Court has consistently held that an appellate court reviews a trial court's ruling on a motion for new trial under an abuse of discretion standard." *State v. Kilgore*, 2025-Ohio-593, ¶ 7 (9th Dist.). This Court likewise reviews a trial court's decision to hold a hearing on a motion for a new trial under an abuse of discretion standard. *See id.* at ¶ 21. An abuse of discretion indicates that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶21} In his merit brief, Mr. Hunter argues that the trial court failed to properly apply the correct legal standard when assessing the credibility of J.E.'s affidavit. Mr. Hunter also argues that the trial court failed to properly apply the standard for granting a motion for a new trial, and that J.E.'s affidavit satisfied that standard. This Court will address each argument in turn.

**The Credibility of J.E.'s Affidavit**

{¶22} Mr. Hunter argues that the trial court cited the Ohio Supreme Court's decision in *State v. Calhoun* regarding assessing the credibility of affidavits, yet "did not discredit [J.E.'s] affidavit under any of those factors[.] [I]nstead the Trial Court's credibility determinations [were] based solely on speculation and conjecture, not evidentiary contradictions or legal disqualifications." This Court disagrees.

{¶23} As Mr. Hunter asserts, the trial court cited *State v. Calhoun*, 86 Ohio St.3d 279 (1999), when assessing the credibility of J.E.'s affidavit. In *Calhoun*, the Ohio Supreme Court set forth a non-exhaustive list of factors a court should consider when assessing the credibility of affidavits in the context of petitions for postconviction relief. *Calhoun* at 284-285; *see State v. Davis*, 2023-Ohio-1657, ¶ 44-45 (9th Dist.). The *Calhoun* factors include:

(1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial.

*Calhoun* at 285. "Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony." *Id.* "Depending on the entire record, one or more of these or other factors may be sufficient to justify the conclusion that an affidavit asserting information outside the record lacks credibility." *Id.*

{¶24} This Court has acknowledged that a trial court can apply the *Calhoun* factors as a "tool" when assessing the credibility of an affidavit attached to a motion for a new trial. *Davis* at ¶ 45. In doing so, we explained that "the *Calhoun* factors are not intended to be exhaustive or exclusive[,]" and that "a credibility assessment is a matter of the trial court's discretion . . . ." *Id.*; *see State v. Lacy*, 2018-Ohio-3249, ¶ 15 (11th Dist.) ("In assessing the credibility of affidavits [attached to a motion for a new trial], the trial court may consider all relevant factors.").

{¶25} Here, the trial court's decision indicates that it considered the *Calhoun* factors when assessing the credibility of J.E.'s affidavit. To that end, the trial court: (1) noted that it presided over Mr. Hunter's trial; (2) concluded that J.E.'s affidavit "complement[ed]" the alleged eyewitness testimony that formed the basis of Mr. Hunter's third (unsuccessful) motion for a new trial; (3) indicated that J.E. was familiar with Mr. Hunter's brother and may have been motivated to assist Mr. Hunter's family in "securing [his] freedom[;]" and (4) compared J.E.'s averments to the evidence the State presented at trial. *See Calhoun*, 86 Ohio St.3d at 285. While the trial court did not specifically address whether J.E.'s affidavit contained or relied on hearsay, it was not required to do so. *See id.*; *Davis* at ¶ 45.

{¶26}  Additionally, the trial court explained that "there is ample reason to doubt the veracity of [J.E.'s] affidavit."  First, the trial court indicated that "the timing of [J.E.'s] affidavit is suspect."  The trial court explained that J.E. came forward as a purported eyewitness to the shooting less than three months after this Court affirmed the trial court's denial of Mr. Hunter's third motion for a new trial (also based upon the discovery of a purported eyewitness), which the trial court described as an "incredible coincidence."  Second, the trial court found J.E.'s explanation for lying to Mr. Hunter's mother and not coming forward with information sooner was "dubious."  The trial court explained that it "beggars belief that [J.E.] would conceal exculpatory information for some 12 plus years, knowing that [Mr. Hunter]—an innocent man and the brother of a person known to [J.E.]—languished in prison, just because he did not feel like getting involved."  Third, the trial court indicated that J.E.'s own admission to lying about his knowledge of the shooting affected his credibility.  The trial court explained that J.E. either lied in 2012 when he told Mr. Hunter's mother that he did not know anything about the shooting, or he was lying now.  The trial court concluded that "[t]his indicates to the Court that [J.E.] is not a person who prioritizes honesty, which militates against [his] credibility."

{¶27}  The trial court then summarized much of the evidence presented at trial, including the text messages exchanged among Mr. Hunter, his co-defendant, and S.S. on the day of the shooting.  The trial court also noted the testimony of Mr. Hunter's mother and grandmother indicating that Mr. Hunter frequently lost his cell phone (ostensibly to explain why the police discovered Mr. Hunter's cell phone in S.S.'s vehicle after the shooting), yet the evidence suggested that Mr. Hunter's grandmother received a text message from Mr. Hunter four hours before the shooting.

{¶28}  After summarizing the evidence (as set forth *Hunter I*), the trial court explained:

> While the Court cannot entirely discount that there is *some possibility* that a jury might be able to reconcile [J.E.'s] account with the State's evidence and therefore find a reasonable doubt as to whether [Mr. Hunter] shot [S.S.], having presided over the trial of this matter, the Court cannot conclude that there is a *probability*, let alone a *strong* probability, it would.

(Emphasis in original.) In doing so, the trial court cited this Court's precedent for the proposition that "[t]he 'mere possibility' that a new trial might lead to a different outcome is not a sufficient basis upon which to grant a motion for a new trial." *State v. Bressi*, 2020-Ohio-4, ¶ 26 (9th Dist.), quoting *State v. Prade*, 2018-Ohio-3551, ¶ 41 (9th Dist.). The trial court then concluded:

> The best interpretation of the evidence was, and would remain even with [J.E.'s] testimony, that [Mr. Hunter] was in possession of his cell phone all day on [the day of the shooting], that [Mr. Hunter] planned with [his co-defendant] to rob [S.S.], that [Mr. Hunter] shot and killed [S.S.] at some point during the planned robbery, and that amidst this chaos, [Mr. Hunter] left his cell phone in [S.S.'s] car.

{¶29} Despite Mr. Hunter's arguments to the contrary, this Court concludes that the trial court applied the correct legal standard when it assessed the credibility of J.E.'s affidavit. This Court's review of the record indicates that the trial court thoroughly reviewed J.E.'s affidavit and assessed its credibility based upon the context in which it was made, the averments it contained, and in comparison to the evidence presented at trial. Mr. Hunter has failed to establish that the trial court abused its discretion when it determined that J.E.'s affidavit lacked credibility.

### The *Petro* Test

{¶30} Next, Mr. Hunter argues that the trial court abused its discretion when it denied his motion for a new trial because J.E.'s affidavit satisfied the standard for granting a motion for a new trial set forth in *State v. Petro*, 148 Ohio St. 505 (1947). For the following reasons, this Court disagrees.

{¶31} The requisites for granting a new trial based upon newly discovered evidence are set forth in *Petro*, which provides:

> To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

*Id.* at syllabus. "The *Petro* test is in the conjunctive. Therefore, all six factors must be satisfied to justify granting a motion for new trial." *State v. Carter*, 2024-Ohio-5193, ¶ 31 (9th Dist.).

{¶32} Here, the trial court denied Mr. Hunter's fourth motion for a new trial based on Mr. Hunter's failure to satisfy the first *Petro* factor, that is, that the new evidence did not "disclose[] a strong probability that it will change the result if a new trial is granted . . . ." *Petro* at syllabus. In doing so, the trial court made two alternative holdings. First, the trial court determined that J.E.'s affidavit lacked credibility and concluded that "there is not a strong probability that [J.E.'s] testimony, if offered at trial, would change the outcome if a new trial were granted." Alternatively, the trial court determined that "even putting aside the Court's misgivings about [J.E.'s] credibility, in consideration of all the evidence presented at [Mr. Hunter's] trial, the Court concludes there is not a strong probability that [J.E.'s] testimony would change the result."

{¶33} In his merit brief, Mr. Hunter argues that J.E.'s affidavit "negates every element of the state's theory of the case because it is direct evidence [he] did not sho[o]t and kill [S.S.]" Mr. Hunter also argues that the trial court's denial of motion for a new trial was "based largely on credibility issues but without an oral evidentiary hearing credibility cannot be thoroughly examined." This Court disagrees.

{¶34} This Court has already concluded that the trial court did not err when it determined that J.E.'s affidavit lacked credibility. It follows that the trial court did not err when it determined that J.E.'s affidavit did not satisfy the first *Petro* factor, that is, that the new evidence "discloses a

strong probability that it will change the result if a new trial is granted . . . ." *Petro*, 148 Ohio St. at syllabus. Having determined that J.E.'s affidavit did not disclose a strong probability that it would change the result if a new trial was granted, the trial court likewise did not err by denying Mr. Hunter's motion without holding a hearing. *See Carter*, 2024-Ohio-5193, at ¶ 31 (9th Dist.) (explaining that all six *Petro* factors must be satisfied to justify granting a motion for a new trial); *Kilgore*, 2025-Ohio-593, at ¶ 21-21 (9th Dist.) (explaining that a hearing is not warranted unless the newly discovered evidence presents a strong possibility that a new trial might reach a different result). Consequently, Mr. Hunter's arguments lack merit.

{¶35} In light of the foregoing, Mr. Hunter's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

**THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT['']S MOTION FOR NEW TRIAL WHERE THE NEWLY DISCOVERED EVIDENCE IS SUFFICIENT TO GRANT APPELLANT A NEW TRIAL.**

{¶36} In his third assignment of error, Mr. Hunter again argues that the trial court abused its discretion when it denied his motion for a new trial. This time, Mr. Hunter relies solely on *Petro* and again argues that J.E.'s affidavit satisfied all the *Petro* factors.

{¶37} Initially, this Court again notes that the trial court based its denial of Mr. Hunter's motion for a new trial solely on his failure to establish the first *Petro* factor, that is, that the new evidence "discloses a strong probability that it will change the result if a new trial is granted . . . ." *Petro*, 148 Ohio St. at syllabus. In our resolution of Mr. Hunter's second assignment of error, this Court concluded that the trial court did not abuse its discretion in reaching this conclusion. Thus, Mr. Hunter's third assignment of error, which presents substantially the same argument, likewise lacks merit and is overruled.

**ASSIGNMENT OF ERROR I**

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION FOR A NEW TRIAL BASED ON PERSONAL BIAS AND PRECONCEIVED JUDGMENT RATHER THAN NEUTRAL ASSESSMENT OF THE NEWLY DISCOVERED EVIDENCE, DEMONSTRATING JUDICIAL BIAS, DEPRIVING APPELLANT OF DUE PROCESS AND THE RIGHT TO A FAIR AND IMPARTIAL TRIBUNAL.**

{¶38} In his first assignment of error, Mr. Hunter argues that the trial court demonstrated judicial bias in its denial of his motion for a new trial, which deprived him of his right to due process and a fair and impartial tribunal. For the following reasons, this Court overrules Mr. Hunter's first assignment of error.

{¶39} "'The term 'judicial bias' has developed two related but independent meanings' which has resulted in confusion regarding an appellate court's jurisdiction over judicial bias claims." (Alteration omitted.) *King v. Divoky*, 2021-Ohio-1712, ¶ 43 (9th Dist.), quoting *State v. Loudermilk*, 2017-Ohio-7378, ¶ 17 (1st Dist.). "One meaning of judicial bias 'relates to the formal process used to remove a judge from hearing a case because the judge has an interest in the matter or is prejudiced in favor of one party[,]' while the other type of judicial bias 'occurs when a judge's conduct in overseeing a case prevents a party from receiving a fair trial.'" (Alteration in original.) *King* at ¶ 43, quoting *Loudermilk* at ¶ 17. This Court has no authority to review the former. *King* at ¶ 44. Regarding the latter, if a defendant asserts that the trial court's bias deprived him of due process, then this Court has authority to review his claim. *Id.* at ¶ 45. Here, Mr. Hunter claims the trial court exhibited bias when it denied his motion for a new trial, which deprived him of his right to due process. Thus, this Court has authority to review his claim. *See id.*

{¶40} "Judicial bias is demonstrated by 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind

which will be governed by the law and [the] facts.'" (Alteration in original.) *King* at ¶ 47, quoting *State v. Jackson*, 2016-Ohio-5488, ¶ 33. "A judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions." *King* at ¶ 47, quoting *In re Disqualification of George*, 2003-Ohio-5489, ¶ 5.

{¶41} In support of his assignment of error, Mr. Hunter asserts that the trial court exhibited judicial bias when it determined that J.E.'s affidavit lacked credibility. Mr. Hunter specifically takes issue with the "choice of words and comments" the trial court used in its decision, claiming they demonstrate the trial court based its decision on "personal disbelief and emotion" rather than the evidence before it. This Court disagrees.

{¶42} Having reviewed the entire decision of the trial court, this Court concludes that nothing in its decision reflects a bias against Mr. Hunter that deprived him of due process. Rather, the trial court's decision indicates that it relied on the underlying record, conducted a thorough review of Mr. Hunter's motion and the attached affidavits, and applied the proper legal standards. Mr. Hunter simply disagrees with the trial court's conclusions and the words/phrases it used in reaching those conclusions. Mr. Hunter's disagreement with the trial court's choice of words and legal conclusions does not establish bias. *See King*, 2021-Ohio-1712, at ¶ 48 (9th Dist.) ("[D]isagreement with a judge's ruling on legal issues . . . [is] not evidence of bias or prejudice, but rather issues subject to appeal."). Accordingly, Mr. Hunter's first assignment of error is overruled.

II.

{¶43} Mr. Hunter's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JILL FLAGG LANZINGER
FOR THE COURT

HENSAL, J.
SUTTON, J.
CONCUR.


APPEARANCES:

GEVONTE HUNTER, pro se, Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.